**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60643
_____

CAROL STEWART KEMP,

                    Plaintiff-Appellant,

v.

G D SEARLE & CO,

                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

January 6, 1997

Before KING, JONES, and DUHÉ, Circuit Judges.

KING, Circuit Judge:

     Carol Stewart Kemp brought this products liability action
based on an allegedly defective intrauterine device.  Both sides
filed motions for summary judgment based on the statute of
limitations.  The trial court granted the motion of the
defendant, G.D. Searle & Co., and denied Kemp's motion.  Kemp
timely appealed.  We affirm.

## I.  BACKGROUND

     In the light most favorable to Kemp, as we must review a
summary judgment, the facts are as follows.  In 1977, Kemp was
prescribed a Copper 7 ("Cu-7") intrauterine device ("IUD"),

manufactured by G.D. Searle & Co. ("Searle"), for birth control. In a routine procedure, this first IUD was removed and a second one inserted by Dr. Susan Hakel in July of 1980. In August of 1984, after Kemp went to an emergency room complaining of abdominal cramps, she was diagnosed with pelvic inflammatory disease ("PID"). Later that month, Dr. Hakel removed the IUD and prescribed oral contraceptives for Kemp. It is unclear whether Hakel indicated to Kemp at that time that the PID had been caused by the IUD.

In December of 1985, Kemp went to Hakel for an annual checkup. Kemp asked Hakel about the possibility of tubal scarring from her PID incident; in her records regarding this visit, Dr. Hakel made this notation: "had PID with Copper 7, wonders re tubal scarring." The details of the conversation that followed are unclear, but Kemp was told at least of the connection between the IUD and her PID and that PID can lead to tubal scarring which, if severe enough, can result in infertility. There are two procedures to diagnose infertility from tubal scarring: an hysterosalpingogram and a laparoscopy. Dr. Hakel described these procedures as "invasive, painful, [and] expensive" and recommended that Kemp not undergo these procedures until she had attempted conception for at least twelve to eighteen months. According to Kemp, Dr. Hakel told her that "no doctor would perform such [an] invasive operative procedure[] until I first attempted unsuccessfully to conceive for eighteen months."

Within a few months of her conversation with Dr. Hakel, Kemp married Sam Abazari, but for personal reasons they never attempted conception. Kemp and Abazari divorced in October of 1989. In January of 1993, Kemp decided to begin attempting conception with Charles Kemp, whom she later married. In April of 1993, Kemp received treatments for pelvic pain that was unrelated to her previous PID. During the course of treatment, Kemp underwent a laparoscopy, which revealed that her fallopian tubes were severely scarred. Kemp was told that the scarring was so severe that she would be unable to conceive naturally. This was the first time that Kemp knew of her infertility. Despite the diagnosis that natural conception was impossible, Kemp and her husband attempted, unsuccessfully, to conceive.

On November 24, 1993, Kemp filed suit in Mississippi state court. Searle removed the suit to federal district court based on diversity of citizenship. Kemp moved for partial summary judgment on Searle's affirmative defense of statute of limitations. Searle made a counter-motion for summary judgment, asserting that Kemp's action was barred by Mississippi's statute of limitations.[1] The district court granted Searle's motion, concluding the statute of limitations on Kemp's cause of action began running at the latest in December of 1985 because of Kemp's

---

[1] The parties agree that the limitations period governing this suit is six years. However, the statute has subsequently been amended to allow only three years. *See* MISS. CODE ANN. § 15-1-49 (1995); *Owens-Illinois, Inc. v. Edwards*, 573 So. 2d 704, 705 (Miss. 1990).

discussion with Dr. Hakel regarding the connections between the IUD, PID, scarring, and infertility.  Kemp timely appealed.

On appeal, Kemp argues that her injury is the infertility, which she did not discover until April of 1993.  Kemp asserts that she exercised reasonable diligence in discovering the infertility because she relied upon her physician's advice not to seek the diagnostic procedures until she had attempted conception for twelve to eighteen months.  Kemp maintains that because she acted with reasonable diligence, her claim is timely under Mississippi's discovery rule.

Searle counters that Kemp's claim is barred because she had only one cause of action that accrued when she discovered that her IUD had caused her an injury, namely the PID.  Thus, Kemp's diligence in discovering her infertility is irrelevant.  In the alternative, Searle insists that Kemp did not act with reasonable diligence because she waited too long before undergoing the diagnostic procedures.

We hold that Kemp had a single cause of action that accrued when she discovered the PID and its source, which was more than six years before filing suit.  Thus, we affirm.

## II.  STANDARDS OF REVIEW

We review the granting of summary judgment de novo, applying the same criteria used by the district court in the first instance.  *Texas Medical Ass'n v. Aetna Life Ins. Co.*, 80 F.3d 153, 156 (5th Cir. 1996).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

4

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Questions of statutory interpretation are questions of law and thus reviewed de novo. *Estate of Bonner v. United States*, 84 F.3d 196, 197 (5th Cir. 1996).

Because this is a diversity action, we must apply Mississippi substantive law. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). In doing so, we must reach the decision we think the Mississippi Supreme Court would reach. *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 396-97 (5th Cir.) (en banc), *cert. denied*, 478 U.S. 1022 (1986). "We are emphatically not permitted to do merely what we think best; we must do that which we think the Mississippi Supreme Court would deem best." *Id.* at 397.

### III.  ANALYSIS

Kemp asks us to hold that a fact issue exists as to whether she acted with reasonable diligence in discovering her infertility. Before we can determine this, we must first establish whether Kemp has a cause of action for infertility. Kemp recognizes that she could have sued based on her PID and that the statute of limitations has run on that claim. The question then is whether Kemp's infertility gives rise to an additional cause of action. Because we hold that Kemp had only one cause of action and that the infertility does not give rise to a new cause of action, we do not reach the question whether

5

Kemp acted with reasonable diligence in discovering her infertility and we express no opinion on the matter.

**A.**

Searle urges us to follow cases from several other circuits that have addressed this specific issue. For example, the First Circuit, in *Gagnon v. G.D. Searle & Co.*, 889 F.2d 340 (1st Cir. 1989), discussed the statute of limitations for a woman who had a Cu-7 IUD and began experiencing cramping, infections, fever, etc., and eventually developed PID, leading to a total hysterectomy. *Id.* at 340. The court held that the statute of limitations began running when she first began experiencing symptoms that she suspected were caused by the IUD, not when she knew the full extent of her injuries, and therefore her suit for injuries including the hysterectomy was barred. *Id.* at 343. Similarly, the Second, Fourth, Seventh, and Eighth Circuits held that the relevant statute of limitations began to run for a plaintiff seeking to recover for injury caused by an IUD when she discovered that she had PID and that the PID was caused by an IUD. A plaintiff in such a situation cannot split her cause of action into one for PID and one for infertility, even though she did not realize the full extent of her injuries -- specifically, her infertility -- until years later. *See Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 137-39 (2d Cir. 1992); *Granahan v. Pearson*, 782 F.2d 30, 31-33 (4th Cir. 1985); *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1103, 1105-06 (7th Cir. 1985); *Klempka v. G.D. Searle & Co.*, 963 F.2d 168 (8th Cir. 1992); *cf. Cacciacarne v.*

6

*G.D. Searle & Co.*, 908 F.2d 95 (6th Cir. 1990) (holding that plaintiff's cause of action did not accrue until she discovered her infertility, even though the IUD had previously caused the plaintiff difficulties, because the injury was not certain and clear enough to trigger limitations before the definitive diagnosis).  While factually similar and persuasive, these cases are legally distinguishable because each is based upon the law of the particular state at issue, not Mississippi law.  *See Gagnon*, 889 F.2d at 341 (New Hampshire); *Gnazzo*, 973 F.2d at 138 (Connecticut); *Granahan*, 782 F.2d at 31 (Virginia); *Cacciacarne*, 908 F.2d at 96 (Ohio); *Miller*, 766 F.2d at 1103 (Indiana); *Klempka*, 963 F.2d at 169 (Minnesota).

### B.

Thus, the key inquiry in the case at bar is the law of Mississippi.  The Mississippi Code section applicable to this case provides as follows:

> (2)  In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

MISS. CODE ANN. § 15-1-49(2).  In *Owens-Illinois, Inc. v. Edwards*, 573 So. 2d 704, 709 (Miss. 1990), the Mississippi Supreme Court sitting en banc held that section 15-1-49 applies to products liability cases.  The court held that "[t]he cause of action accrues and the limitations period begins to run when the plaintiff can reasonably be held to have knowledge of the injury or disease."  *Id.*  Furthermore, Mississippi has long followed the

general rule that "a tortious act gives rise to but a single cause of action." *McDonald v. Southeastern Fidelity Ins. Co.*, 606 So. 2d 1061, 1064 (Miss. 1992). Kemp concedes that she could have sued Searle in December of 1985 when she knew of her PID and that Searle's IUD had caused her PID. Because infertility is merely a sequela of PID and not a separate disease, the tortious act that led to Kemp's PID was the same tortious act that led to her infertility. Thus, we see no reason to believe that Mississippi would depart from its well-settled rule that a tortious act gives rise to only one cause of action, and that the statute of limitations applicable to the single cause of action in this case began to run no later than December of 1985 with Kemp's conversation with Dr. Hakel.

## c.

None of the Mississippi cases Kemp cites dictates a contrary result. Kemp cites many discovery rule cases such as *Williams v. Kilgore*, 618 So. 2d 51 (Miss. 1992), and *Smith v. Sanders*, 485 So. 2d 1051 (Miss. 1986). However, these cases merely reiterate that the general rule of section 15-1-49 that the time of the discovery of the injury is also the time when the statute of limitations begins to run. *Williams*, 618 So. 2d at 55; *Smith*, 485 So. 2d at 1052. We agree: the time that Kemp discovered her PID is crucial. These cases do not even suggest a departure from the well-settled rule that Kemp had only one cause of action for her injuries from the IUD.

8

Relying on *Schiro v. American Tobacco Co.*, 611 So. 2d 962, 965 (Miss. 1992), Kemp argues that the statute of limitations as to her infertility could not have begun to run until the infertility was diagnosed. In *Schiro*, plaintiff Schiro sued four cigarette manufacturers in products liability, alleging that their unreasonably dangerous and unsafe cigarettes caused her to develop cancer. *Id.* at 962-63. Schiro began smoking in 1943. *Id.* at 963. She developed emphysema in the late 1960s or early 1970s, and she stopped smoking in 1977. *Id.* In April of 1981, she began coughing up blood, and at this time Schiro believed she had cancer, even though her doctor assured her she did not. *Id.* She coughed up blood again in November of 1981. *Id.* On December 27, 1981, a small mass was detected in Schiro's chest, which was determined two days later to be lung disease. *Id.* On January 24, 1982, the mass was diagnosed as cancer. *Id.* On January 22, 1988, Schiro filed suit. *Id.* The defendants filed for summary judgment, arguing that Schiro's suit accrued at least in April 1981 when Schiro began coughing up blood or December 29, 1981, when the lung mass was discovered, and the lower court granted the motion. *Id.* at 963-64. The Mississippi Supreme Court disagreed. The court held that the cause of action accrued with the cancer diagnosis. *Id.* at 965. The court determined that Schiro's belief that she might have cancer was insufficient to trigger limitations because "[a] belief is nothing more than an opinion or a person's view of something unsubstantiated by proof." *Id.*

While facially similar to the case at bar, *Schiro* does not command the result Kemp desires. While the cancer diagnosis was necessary to confirm that Schiro's disease was in fact cancer, Kemp had a diagnosis of her disease –– she was diagnosed with PID in August of 1984. Because infertility is not a separate and distinct disease but an aftereffect of the PID, a later diagnosis of infertility is irrelevant to the commencement of the statute of limitations.

Kemp asserts that it is "well settled Mississippi law that the gravity of the injury is a significant factor to be considered in determining whether a plaintiff has brought his or her action within the applicable limitations period." For example, in *Struthers Wells-Gulfport, Inc. v. Bradford*, 304 So. 2d 645 (Miss. 1974), plaintiff Bradford was bitten by what was believed to be a poisonous brown recluse spider in December of 1968. *Id.* at 646. She immediately began developing complications, including a kidney infection. *Id.* Bradford had intermittent problems over the next few years, and in February of 1972, she was diagnosed with a vasculitis infection in a blood vessel. *Id.* at 646-47. Although her employer's insurance had paid most of her medical bills, after the vasculitis infection diagnosis, Bradford applied for disability benefits. *Id.* at 647. The employer argued that she was barred by the two-year limitations period for making such claims because she knew of her injury from the spider in 1968. *Id.* at 648. The court, construing the workers' compensation statute, held that the

employer was not required to pay disability compensation until "it became reasonably apparent that she had a disability arising [from the spider bite]" and concluded that until she was diagnosed with vasculitis, Bradford had no injury serious enough to qualify for disability benefits. *Id.* at 649. *Bradford* is distinguishable from the case at bar because Kemp had a compensable injury with the PID, even though she may not have realized that she was infertile until much later.

Kemp also points to *Pittman v. Hodges*, 462 So. 2d 330 (Miss. 1984), to support her argument that the gravity of the injury must be considered in determining when limitations begins. In *Pittman*, the plaintiff's suit was filed two years and seven days after the defendant dentist last saw the plaintiff for care relating to a wisdom tooth extraction. *Id.* at 331. On this last visit as well as during previous visits, the plaintiff had complained of numbness, and the defendant told him that the numbness was only temporary and could last for as little as a few works or as long as a year. *Id.* at 332. The numbness turned out to be permanent. *Id.* at 333. The dentist argued that the statute of limitations began when the plaintiff discovered the numbness. *Id.* The court disagreed, stating that "the essence of the injury" was the permanent nature of the injury, which could not have been discovered until the period of temporary numbness had passed, and thus limitations began when that temporary numbness period expired. *Id.* Relying on *Pittman*, Kemp argues that she did not discover the essence of her injury until she was

11

diagnosed with infertility and thus limitations did not begin to run until that discovery.  However, *Pittman* does not apply because the plaintiff did not even know he had been injured until he discovered that the temporary numbness was really permanent. Kemp knew she was injured when she was diagnosed with PID.  That she later discovered an aftereffect of that injury does not change the fact that she knew she was injured.

Kemp insists that because PID and infertility are not synonymous, limitations for a cause of action for infertility should be measured on a different timeline than an action for PID.  We in no way mean to suggest that PID and infertility are synonymous.  However, they are both the product of the same chain of causality:  the IUD caused the PID, and the PID caused the infertility.  Cases in other contexts, such as asbestos, have distinguished between two separate, distinct diseases and two interrelated conditions.[2]  *See, e.g.*, *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111 (D.C. Cir. 1982).  In the case at bar, there is but one disease -- PID; the infertility is not a separate disease, but a complication of the PID.  We express no opinion with regard to a situation involving a later-manifesting disease that is totally separate and distinct from the initial

---

[2]  For example, following exposure to asbestos, an individual can contract asbestosis or mesothelioma.  These diseases can emerge years apart from each other.  The asbestosis is related to the mesothelioma only in the sense that both are caused by exposure to asbestos.  However, mesothelioma develops independently of asbestosis; it is possible to have mesothelioma without ever having asbestosis, and vice versa.  *See Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 113, 117 (D.C. Cir. 1982).

injury. We simply hold that the district court was correct in concluding that Kemp's injury was the PID and that the statute of limitations began to run when she knew of her injury and its cause, not when she later discovered all of the consequences and complications of the PID.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM.