**Luqman YACUB, et al., Plaintiffs,**

v.

**SANDOZ PHARMACEUTICALS CORPORATION, et al., Defendants.**

**No. C–3–96–297.**

United States District Court,
S.D. Ohio,
Western Division.

Aug. 20, 1999.

Richard Michael Hunt, Hunt, Skilken & Wehner—3, Dayton, OH, Thomas J. Replogle, Skilken & Replogle, Dayton, OH, for plaintiffs.

Kerry Carson Green, Dinsmore & Shohl—1, Cincinnati, OH, for defendants.

## DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR RECONSIDERATION (DOC. # 41); DEFENDANT SANDOZ PHARMACEUTICALS CORPORATION'S MOTION FOR RECONSIDERATION (DOC. # 54) OVERRULED; BIFURCATION ORDERED ON ITS MERITS WITH RESPECT TO STATUTE OF LIMITATIONS ISSUE, PLAINTIFF HAVING NOT OPPOSED SAME; CONFERENCE CALL SET

RICE, Chief Judge.

This litigation arises out of the death of Cheryl Yacub on February 17, 1991. The Plaintiff, who is her surviving spouse and the administrator of her estate, brought this action on behalf of the estate and Mariam Yacub, his minor child. The Plaintiff contends that the death of Cheryl Yacub (hereinafter "Cheryl Yacub" or "Yacub") was caused by her taking Parlodel, a drug manufactured by Defendant Sandoz Pharmaceuticals Corporation ("Sandoz").[1] His Amended Complaint sets forth, in effect, two claims for relief: a survivorship claim on behalf of the estate, and a loss of consortium claim on behalf of Mariam Yacub.[2]

In a March 27, 1998, Decision and Entry (Doc. # 39), the Court sustained in part and overruled in part a Motion for Summary Judgment (Doc. # 20) filed by Sandoz. The Court sustained the Motion to the extent that it sought summary judg-

---

1. Sandoz is now known as Novartis Pharmaceuticals Corporation. The Court previously dismissed Sandoz, Ltd., Sandoz' Swiss parent corporation (the other Defendant named herein), for want of personal jurisdiction. *See* Doc. # 28.

2. Although the Plaintiff's Amended Complaint contains four claims for relief, the Court noted in its March 27, 1998, Decision and Entry that they set forth different legal theories supporting the survivorship and loss of consortium claims. *See* Doc. # 39.

ment on the Plaintiff's survivorship claim, which the Court found time-barred by the statute of limitations. The Court overruled the Motion, however, insofar as it sought summary judgment on the loss of consortium claim. The Court also noted that it would file an Expanded Opinion, with reasoning and citation to authority, supporting its decision concerning the survivorship claim.

Upon further reflection, however, the Court reconsidered its ruling and found that the Plaintiff's survivorship claim was not barred by the applicable statute of limitations. As a result, in a December 22, 1998, Decision and Entry (Doc. # 48), the Court vacated its prior Decision and Entry (Doc. # 39), insofar as that ruling had granted Sandoz summary judgment on the Plaintiff's survivorship claim. Thereafter, Sandoz filed a Motion for Reconsideration (Doc. # 54), directed toward the Court's December 22, 1998, ruling regarding the statute of limitations and the Plaintiff's survivorship claim. That Motion is pending before the Court for resolution. Also pending before the Court is an October 29, 1998, Motion for Reconsideration (Doc. # 41), filed by the Plaintiff. In that Motion, the Plaintiff seeks reconsideration of the Court's September 22, 1998, Decision and Entry (Doc. # 40), overruling his "Partial Motion for Summary Judgment" (Doc. # 34). Specifically, the Plaintiff re-raises his previously-rejected argument that collateral estoppel precludes Sandoz from litigating the safety of Parlodel. As a means of analysis, the Court first will address the Plaintiff's Motion for Reconsideration (Doc. # 41). The Court then will consider Sandoz' Motion for Reconsideration (Doc. # 54).

1. *Plaintiff's Motion for Reconsideration (Doc. # 41)*

■ In his Motion for Reconsideration, the Plaintiff challenges the Court's prior ruling that collateral estoppel does not preclude Sandoz from litigating the issue of Parlodel's safety as a lactation inhibitor. The Plaintiff previously filed a Motion for Partial Summary Judgment (Doc. # 34) on this issue, arguing that collateral estoppel should apply, based upon a 1994 Food and Drug Administration order which withdrew approval for Parlodel's use as a physiological lactation inhibitor. In its September 22, 1998, Decision and Entry (Doc. # 40), the Court rejected the Plaintiff's collateral estoppel argument for several reasons. *First* the Court noted the absence of "mutuality," which is a requirement for collateral estoppel under Ohio law. (*Id.* at 6–8). *Second,* the Court reasoned that the Plaintiff had failed to establish the elements of collateral estoppel under federal law.[3] In particular, the Court noted that the FDA had essentially entered a default judgment against Sandoz. The Court then recognized that issues resolved by default are not considered to have been "actually litigated" for collateral estoppel purposes. (*Id.* at 9). Additionally, the Court noted that the precise issues raised in this case had not been raised in the FDA action. Specifically, the Court reasoned: "Plaintiff's state law claims ask the jury to determine whether the Defendant breached a duty it owed to Cheryl Yacub ... by marketing Parlodel for the treatment of physiological lactation in February, 1991. The FDA, on the other hand, determined in December, 1994, that the evidence, then available, did not establish that said drug was safe and effective for that use." (*Id.*). *Finally,* the Court found collateral estoppel inapplicable because Sandoz had maintained the burden of proof in the FDA action, whereas the Plaintiff bears the burden of proof in this litigation. (*Id.*).

■ Notably, the Plaintiff's Motion for Reconsideration fails to address the Court's analysis or any of the foregoing legal conclusions. Rather, in a "Preliminary Statement," the Plaintiff contends that the Court misconstrued the nature of

---

3. Although the Court found Ohio law applicable to the collateral estoppel issue, it found the Plaintiff's argument equally unavailing under federal law. (*Id.* at 8).

his prior Motion. In particular, he insists that "[t]he only issue tendered on partial summary judgment ... is that there is no substantial controversy as to the material fact that there is a final adjudication by the FDA regarding withdrawal of the new drug Parlodel...." (Doc. # 41 at 3). In his prior Motion, however, the Plaintiff did not seek to have the mere existence of an FDA withdrawal order established. Indeed, the existence of such an order could not be seriously disputed. Rather, the Plaintiff sought to have certain facts conclusively established, through collateral estoppel, based upon that FDA order. In particular, the Plaintiff relied upon the doctrine of collateral estoppel to prevent Sandoz from litigating the safety of Parlodel in the present action.

The Court previously rejected the Plaintiff's reliance upon collateral estoppel, however, and his Motion for Reconsideration fails to mention the Court's detailed substantive analysis of the issue. With the exception of his "Preliminary Statement," the Plaintiff's Motion for Reconsideration (Doc. # 41) simply repeats, verbatim, the arguments advanced in his earlier Reply Memorandum (Doc. # 37) in support of his failed "Partial Motion for Summary Judgment" (Doc. # 34). In short, given the Plaintiff's failure even to address the legal analysis set forth in the Court's September 22, 1998, Decision and Entry, the Court discerns no meritorious basis upon which to reconsider that ruling. Accordingly, the Plaintiff's Motion for Reconsideration (Doc. 41) is OVERRULED.

## II. *Defendant's Motion for Reconsideration (Doc. # 54)*

In its Motion for Reconsideration, Sandoz alleges that the Court erred by over-ruling its prior Motion for Summary Judgment (Doc. # 20), insofar as said Motion raised a statute of limitations defense to the Plaintiff's survivorship claim. More specifically, Sandoz asserts that this Court's December 22, 1998, ruling on the statute of limitations issue "construed the discovery rule for [Ohio Revised Code] § 2305.10 more expansively than any previous Ohio state court judge or federal court interpreting Ohio's law on the statute of limitations." (Doc. # 54 at 4). In support of this startling assertion, Sandoz reads the Court's prior Decision and Entry (Doc. # 48) as turning well-settled Ohio law on its head and adopting a new standard to determine when a product liability cause of action accrues. After reviewing the analysis set forth in its prior ruling, however, and the arguments contained in Sandoz' Motion for Reconsideration, the Court cannot agree that its December 22, 1998, ruling constitutes a sweeping departure (or any departure) from existing case law construing § 2305.10.[4]

■ The sole issue before the Court is whether the Plaintiff's survivorship claim is barred by the applicable statute of limitations. The parties agree that the claim is a product liability action subject to the two-year statute of limitations imposed by Ohio Rev.Code § 2305.10. Consequently, under settled Ohio law, the Plaintiff's cause of action accrued, and started the running of the statute of limitations, when he (1) knew or reasonably should have known of Cheryl Yacub's injury, and (2) knew or reasonably should have known that her exposure to Parlodel proximately caused that injury.[5] *See Cacciacarne v.*

4. As the Court will demonstrate herein, however, the state courts have been less than consistent when describing the circumstances under which the two-year statute of limitations set forth in § 2305.10 will begin to run.

5. In its Motion for Reconsideration, Sandoz suggests that a claim arises, for purposes of § 2305.10, when a plaintiff first discovers that he or she has been injured at all, without respect to any awareness of the injury's cause. (Doc. # 54 at 6). This assertion is inconsistent with Ohio law. Both the Sixth Circuit and the Ohio Supreme Court have explicitly recognized that "knowledge of the injury's cause is a part of the knowledge required before a statute of limitations may begin to run." *Burgess v. Eli Lilly & Co.*, 66 Ohio St.3d 59, 609 N.E.2d 140, 141 (1993); *Cacci-*

*G.D. Searle & Co.*, 908 F.2d 95, 97 (6th Cir.1990); *Liddell v. SCA Services of Ohio, Inc.*, 70 Ohio St.3d 6, 13, 635 N.E.2d 1233, 1239 (1994); *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84, 88, 447 N.E.2d 727, 731 (1983); *Viock v. Stowe–Woodward Co.*, 13 Ohio App.3d 7, 467 N.E.2d 1378, 1384 (1983).

The parties agree that the Plaintiff knew of Cheryl Yacub's injury in February, 1991. Thus, as the Court recognized in its December 22, 1998, Decision and Entry, "the critical issue is when the Plaintiff knew or reasonably should have known that Parlodel proximately caused the injury." (Doc. # 48 at 10). In its prior ruling, the Court rejected Sandoz' argument that the statute of limitations began to run, as a matter of law, at the latest in November, 1991, when the Plaintiff obtained certain information about Parlodel from "Medview," a medical review service.[6]

In so doing, the Court noted that the Medview report at issue identified Parlodel as just one of *three* potential causes of his wife's injury. In short, the Court declined to hold that the statute of limitations on the Plaintiff's survivorship claim began to run, as a matter of law, once he learned that Parlodel, pregnancy, *or* a staph infection had caused his wife's unremitting headaches, seizure, and ultimately, her death. The Court reasoned that the present case " 'was not far enough along the scale of clarity and certainty of *condition*

*and cause* to trigger the running of the statute.' " (Doc. # 48 at 29) (Emphasis added) (quoting *Cacciacarne*, 908 F.2d at 98).

In opposition to the Court's ruling, Sandoz previously argued in its Motion for Summary Judgment that the Medview report adequately informed the Plaintiff that his wife's injury "may be related to" Parlodel exposure, thereby triggering the statute of limitations. As the Court recognized in its December 22, 1998, Decision and Entry, however, knowledge that an injury "may be related to" a particular drug is not necessarily sufficient to trigger the statute of limitations contained in Ohio Rev.Code § 2305.10. *See Burgess v. Eli Lilly & Co.*, 66 Ohio St.3d 59, 609 N.E.2d 140, 142 (1993) (declaring unconstitutional certain statutory language which provided for the accrual of a claim upon the discovery that an injury "may be related to" chemical exposure). As the *Burgess* court explained:

> Knowledge of the possibility that an injury may be related to a specific cause simply does not reach the constitutionally mandated threshold granting every person a remedy in due course of law for an injury done.

*Id.* at 142.[7]

In its December 22, 1998, Decision and Entry, however, the Court also recognized

---

acarne v. G.D. Searle & Co., 908 F.2d 95, 97 (6th Cir.1990) (recognizing that "a plaintiff must know or reasonably should have known that his injury was proximately caused by defendant").

6. In its Motion for Summary Judgment, Sandoz had argued that the Plaintiff, or Yacub herself, either knew or should have known that exposure to Parlodel caused her severe headaches and seizures: (1) shortly after she began taking the drug in February, 1991; (2) when the Plaintiff consulted three different attorneys later in 1991; or (3) at the latest, in November, 1991, when the Plaintiff obtained information about Parlodel from the medical review service. If the Plaintiff or his now-deceased wife knew, or should have known, with sufficient certainty at any of these times

that Parlodel was the cause of her injury, then the Plaintiff's survivorship claim would be barred by the applicable two-year statute of limitations. In its December 22, 1998, Decision and Entry, however, the Court rejected Sandoz' argument that the statute of limitations necessarily began to run, as a matter of law, on one of the foregoing three occasions.

7. Although Sandoz now suggests that *Burgess* "turned on uniquely latent injuries caused by DES" (Doc. # 54 at 6 n. 3), the Ohio Supreme Court's ruling actually contains a thorough and generally applicable analysis of the degree of knowledge that is required to trigger a statute of limitations. Furthermore, in concluding that a plaintiff must know that DES caused her injury, the *Burgess* court merely looked to generally applicable and well-estab-

that a " 'plaintiff need not be able to prove her claim to a degree of metaphysical certitude before' " a cause of action accrues. (Doc. # 48 at 22) (quoting *Burgess*, 609 N.E.2d at 143). Nevertheless, under Ohio law, a plaintiff must know, or should have known, the cause of his or her injury before the statute of limitations will commence. *Id.* at 141–143.

With the foregoing standards in mind, the Court previously concluded that the statute of limitations issue turned upon the degree of certitude necessary to satisfy the "know or reasonably should have known" requirement set forth above. The Court then obtained guidance from, inter alia, the Sixth Circuit's ruling in *Cacciacarne*, 908 F.2d at 95, reasoning:

> ... In *Cacciacarne*, an Ohio diversity action, the plaintiff had an intrauterine device ("IUD") inserted in 1978. She subsequently had the IUD removed because she was experiencing pain. *Id.* at 96. After having difficulty conceiving a child in 1984, the plaintiff consulted a specialist, who voiced his suspicion that the IUD was responsible for her blocked fallopian tubes, which was causing the fertility problem. *Id.* The doctor also suspected, however, that the problem might be due to endometriosis or might be hormone-related. He subsequently performed surgery a month later and discovered that the tubes no longer were blocked. No further discussion about the cause of blockage occurred. *Id.* Thereafter, in 1985, the plaintiff met with the doctor again, and he informed her that one tube still was blocked. *Id.* In April, 1986, a different doctor told the plaintiff that she was unable to become pregnant. He stated that the IUD was the most likely cause. *Id.*
>
> Given these facts, the Sixth Circuit concluded that the statute of limitations on the plaintiff's subsequent product liability lawsuit against the IUD manufac-

turer did not commence until April 1996, when she learned that she would not be able to conceive. *Id.* at 97.... In reaching this result, the court reasoned:

> > "Applying either the *O'Stricker* test or the *Allenius* 'cognizable event' test, we hold that plaintiff's cause of action did not accrue until Dr. Schmidt informed her she would not be able to conceive. Prior to that time there was no certainty about plaintiff's condition, or the cause of her condition. The nature of the problem was unclear. The precise question is whether Dr. Seiler's statement to the plaintiff that the IUD might be the cause of her tubal blockage was enough to put her 'on notice of the need to pursue [her] possible remedies.' *Allenius*, 538 N.E.2d at 96.... It is undisputed that plaintiff thought the IUD might possibly have caused her problem. But her doctor did not know the cause. He did not rule out endometriosis or other possible causes. Because plaintiff's doctor did not know the cause, 'it would be illogical to hold [her] to a higher degree of knowledge than [her] ... physician[ ].... This case was not far enough along the scale of clarity and certainty of condition and cause to trigger the running of the statute until April[,] 1986.' "

*Id.* at 97–98. [Footnote omitted].

Similarly, in the present case, the Medview report did not inform the Plaintiff, with any degree of certainty, what had caused Cheryl Yacub's injury. Like the plaintiff in *Cacciacarne*, he knew only that her thrombosis-induced headaches and seizure were proximately caused by one of three things: her pregnancy, a staph infection, or her use of Parlodel. The Medview report did not even indicate which one of the three potential causes *most likely* caused her injury. It did note, however, that preg-

---

lished Ohio law regarding § 2305.10 and the so-called "discovery rule." *See, generally,*

*Burgess,* 609 N.E.2d at 141–143.

nancy alone multiplied the risk of thrombosis thirteen times, even though the risk remained small. The report also recognized that pregnancy, when combined with an active staph infection, may have increased Yacub's risk even more. With respect to Parlodel, the report noted 50 incidents of hypertension after using the medication, 38 incidents of seizures, and 15 incidents of strokes. Although the report did not reveal how many women nationwide had been prescribed Parlodel to combat lactation, the Court doubts that these figures represent a large percentage of Parlodel users. Consequently, it cannot be said, based upon the Medview report, that Parlodel probably caused Cheryl Yacub's health problems. Rather, the evidence suggests only that Parlodel *may* have caused Yacub's thrombosis-induced headaches.[8] As a result, the requisite degree of certainty is missing. *Burgess*, 66 Ohio St.3d 59, 609 N.E.2d 140. The record simply does not support a finding that the Plaintiff knew or should have known, after reading the Medview report, that Parlodel proximately caused his wife's injury.

(Doc. # 48 at 22–25).

■ In its Motion for Reconsideration (Doc. # 54), Sandoz first contends that the unprecedented "most likely cause" standard allegedly employed by this Court is contrary to Ohio law. In its prior ruling, however, the Court did not adopt any novel standard. Rather, as the above-quoted language demonstrates, the Court merely reasoned that "it cannot be said, based upon the Medview report, that Parlodel *probably* caused Cheryl Yacub's health problems."[9] (Doc. # 48 at 25) (Emphasis added). Instead, the Court concluded, "the evidence suggests only that Parlodel *may* have caused Yacub's thrombosis-induced headaches." (*Id.*). The Court then held that "the record simply does not support a finding that the Plaintiff knew or should have known, after reading the Medview report, that Parlodel proximately caused his wife's injury." (*Id.*). This is precisely the standard employed by Ohio courts to determine when a cause of action accrues under § 2305.10. *Cf. Liddell v. SCA*, 70 Ohio St.3d 6, 635 N.E.2d 1233, 1239 (1994) (relying upon the seminal Ohio case of *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84, 447 N.E.2d 727 (1983), for its holding that a cause of action arises "upon the date the plaintiff is informed by competent medical authority that he *has been injured by exposure* ... or upon the date on which, by exercise of reasonable diligence, he should have discovered that he had been so injured, whichever date occurs first"); *see also Burgess*, 609 N.E.2d at 143–144 ("This court has already adopted a 'discovery' rule for the accrual

8. Even the Physician's Desk Reference volume quoted by Sandoz notes that "the relationship of these adverse reactions [i.e., seizure, stroke, hypertension, headaches, and visual disturbances] to Parlodel is not certain." (Plaintiff's Responses to Requests for Admission, Appendix at Exh. E, No. 6).

9. Parenthetically, the Court notes that *Sandoz itself* urged the Court to apply a "probably linked" standard to determine when the statute of limitations began running on the Plaintiff's survivorship claim. In its reply Memorandum in support of summary judgment, Sandoz reasoned that the statute of limitations began to run once the Plaintiff discovered that his wife's injury was "probably linked" to Parlodel exposure. (Doc. # 23 at 6).

Sandoz also suggested, however, that the Plaintiff's cause of action accrued, as a matter of law, when he discovered that the injury "may be related to" Parlodel, or when he discovered a "possible connection" between the drug and his wife's injury. (*Id.* at 6–7). In *Burgess*, however, the Ohio Supreme Court soundly rejected the proposition that a cause of action accrues when a plaintiff discovers that an injury "may be related to" exposure. *Burgess*, 609 N.E.2d at 142. The *Burgess* court also rejected Sandoz' argument that awareness of a "possible connection" between an injury and its cause will trigger the statute of limitations. "Knowledge of the possibility that an injury may be related to a specific cause simply does not reach the constitutionally mandated threshold granting every person a remedy in due course of law for an injury done." *Id.*

of product liability claims.... In *O'Strick-er* ..., this court held that '[w]hen an injury does not manifest itself immediately, the cause of action arises upon the date on which the plaintiff is informed by competent medical authority that he has been injured, or upon the date on which, by the exercise of reasonable diligence, he should have become aware that he had been injured, whichever date occurs first.' "[10]; *Telakowicz v. John Bunn Co.*, Ashland App. No. CA–1024 (July 23, 1993) (unreported) (holding that the statute of limitations began to run on the plaintiffs' product liability claim once they "had their suspicions of causation confirmed"); *Colby v. Terminix International Co.*, Stark App. No. 96–CA–0241 (Feb. 10, 1997) (holding that the statute of limitations begins to run in a product liability action when a plaintiff knows the cause of his injury, not when he suspects the cause).

In a second argument, Sandoz contends that the Court previously misread *Cacciacarne*, and that the Sixth Circuit's ruling is "inapposite" to the present case. Specifically, Sandoz reads *Cacciacarne* as finding the plaintiff's cause of action to have accrued "when she first learned that she was injured at all," without any regard to awareness of causation. (Doc. # 54 at 6). In support, Sandoz cites the following sentence from the Sixth Circuit's opinion: "[W]e hold that Plaintiff's cause of action did not accrue until Dr. Schmidt informed her she would not be able to conceive."

*Cacciacarne*, 908 F.2d at 97. Read in isolation, the foregoing sentence does, indeed, suggest that bare knowledge of an *injury* is sufficient to trigger a statute of limitations. Immediately after the quoted sentence, however, the Sixth Circuit continued:

> ... Prior to that time there was no certainty about plaintiff's condition, *or the cause of her condition.* The nature of the problem was unclear. The precise question is whether Dr. Siler's statement to plaintiff that the IUD *might* be the cause of her tubal blockage was enough to put her "on notice of the need to pursue [her] possible remedies." *Allenius*, 538 N.E.2d at 96.... It is undisputed that plaintiff thought the IUD might be the problem. But her doctor did not know the cause. He did not rule out endometriosis or other possible causes. Because plaintiff's doctor did not know the cause, "it would be illogical to hold [her] to a higher degree of knowledge than [her] ... physician[ ]." ... This case was not far enough along the scale of clarity and certainty of *condition and cause* to trigger the running of the statute....

*Id.* at 97–98 (Emphasis added). In light of the foregoing language, the Court cannot agree that the Sixth Circuit found an accrued claim based solely upon the plaintiff's discovery of her injury alone.[11] Nor does the Court find *Cacciacarne* "inappo-

**10.** As noted above, post-*O'Stricker* cases have made clear that the "knowledge of the injury" requirement includes knowledge of the injury's cause. *Burgess*, 609 N.E.2d at 141, citing *Allenius v. Thomas*, 42 Ohio St.3d 131, 538 N.E.2d 93 (1989).

**11.** In support of its reading of *Cacciacarne*, Sandoz cites *Kemp v. G.D. Searle & Co.*, 103 F.3d 405 (5th Cir.1997). In that case, the Fifth Circuit's analysis of *Cacciacarne* consisted of a brief parenthetical. As Sandoz properly notes, however, the *Kemp* court did cite *Cacciacarne* as standing for the proposition that a cause of action accrues when a plaintiff discovers her injury. *Id.* at 408 (citing *Cacciacarne* as holding that "plaintiff's cause of action did not accrue until she discovered her

injury ..."). As the plain language of *Cacciacarne* makes clear, however, the Sixth Circuit actually required knowledge of the injury *and* knowledge of its cause. *See Cacciacarne*, 908 F.2d at 97–98. Furthermore, while Ohio courts sometimes declare that a cause of action accrues when a plaintiff discovers his "injury," such imprecise statements implicitly include a requirement that the plaintiff knew, or should have known, the cause of that injury. Indeed, as noted, *supra*, it is well settled Ohio law that "knowledge of the injury's cause is part of the knowledge required before a statute of limitations may begin to run." *Burgess*, 609 N.E.2d at 141, citing *Allenius*, 538 N.E.2d at 93.

site to this case," as Sandoz asserts. (Doc. #54 at 6). In both cases, the Plaintiff knew of the injury, and knew that the injury was caused by one of three things. In neither case, however, did such knowledge supply sufficient certainty as to causation to trigger the statute of limitations as a matter of law.

In a third argument, Sandoz contends that this Court's December 22, 1998, ruling is contrary to *Liddell v. SCA Services of Ohio*, 70 Ohio St.3d 6, 635 N.E.2d 1233 (1994), and *Holmes v. Community College of Cuyahoga Cty.*, 97 Ohio App.3d 678, 647 N.E.2d 498 (1994). In *Liddell*, the plaintiff filed a negligence claim within two years of being told "by competent medical authorities that the cancerous growth in his nasal cavity might be linked to his exposure to toxic chlorine gas." *Liddell*, 635 N.E.2d at 1239. Consequently, the Ohio Supreme Court concluded that the plaintiff's lawsuit was timely filed. *Id.* Sandoz now seizes upon the "might" language in *Liddell*, suggesting that the Plaintiff's 1991 awareness that Parlodel "might be linked" to his wife's death necessarily triggered the statute of limitations. The Court cannot agree.

The plaintiff in *Liddell* filed his lawsuit within two years of discovering that his injury "might be linked" to chlorine gas exposure. Consequently, the Ohio Supreme Court simply had no occasion to examine whether the plaintiff's lawsuit would have been timely had he *not* filed his complaint within two years of discovering the possible causal connection. Furthermore, the actual holding in *Liddell* supports the Court's result in the present case. The *Liddell* court held:

> We therefore adopt the rationale of *O'Stricker* and elect to extend the *O'Stricker* rule of accrual to the instant case. Accordingly, we rule that when an injury allegedly caused by exposure to toxic chlorine gas does not manifest itself immediately, a cause of action for that injury arises upon the date the plaintiff is informed by competent medi-

cal authority *that he has been injured by exposure* to the gas, or upon the date on which, by exercise of reasonable diligence, he *should have discovered that he has been so injured*, whichever date occurs first.

*Liddell*, 635 N.E.2d at 1239 (Emphasis added). In short, the Court is firmly convinced that the Ohio Supreme Court did not intend to suggest in *Liddell* that a cause of action accrues, as a matter of law, whenever a plaintiff discovers that his injury "might" be linked to a particular cause. Indeed, the Ohio Supreme Court had expressly *rejected* such a proposition less than eighteen months earlier in *Burgess*, 609 N.E.2d at 142, reasoning: "If a plaintiff were to file a complaint stating that she suffered from a bodily injury which *might* be related to DES, the complaint would be dismissed for failure to state a claim."

Sandoz' reliance upon Holmes is equally unavailing. In *Holmes*, 647 N.E.2d at 498, the plaintiff filed a personal injury lawsuit after suffering a shock on January 23, 1987, while performing electrical work. Immediately after receiving the electrical shock, the plaintiff received medical treatment for burns and blurred vision. Fearing heart damage, she also underwent an EKG. *Id.* at 501. Thereafter, the plaintiff began experiencing heart palpations and visited her doctor four times in 1989 and 1990. *Id.* at 501–502. A specialist ultimately expressed his opinion, in March, 1990, that "such electrical shock was the cause of her atrial fibrillation." *Id.* at 501. Upon review, the Eighth District Court of Appeals held that the plaintiff's personal injury cause of action (and her husband's loss of consortium claim) had accrued no later than January 15, 1990, following her fourth visit to her physician, but prior to the specialist's rendering of his March, 1990, opinion on causation. *Id.* at 502. In support of its ruling, the Eighth District Court of Appeals reasoned:

> Plaintiffs were put on notice and knew, or by the exercise of reasonable

diligence should have known, by Susan Holmes' four visits to her physicians regarding her heart palpitations on May 22, 1989, May 30, 1989, December 7, 1989 and January 15, 1990, that her heart condition may have been caused by the occurrence [i.e., electrical shock] of January 23, 1987. The two-year bodily injury statute of limitations began to run on May 22, 1989 when Susan Holmes knew or, by the exercise of reasonable diligence should have known, the connection between the electrical shock and her atrial fibrillation.

*Id.* at 502. In support of its Motion for Reconsideration, Sandoz seizes upon the *Holmes* court's finding that the plaintiff's cause of action accrued upon her discovery "that electricity *could* damage her heart." (Doc. # 54 at 5). Unfortunately, the Court finds *Holmes* of limited persuasive value, however, given its failure even to mention *Burgess* or *Cacciacarne*, two cases which cast some doubt on the Eighth District's reasoning, and upon which the Court has placed considerable reliance herein.

In any event, the Eighth District's conclusion is not necessarily inconsistent with the result this Court reached in its December 22, 1998, Decision and Entry. A plaintiff's awareness that a particular product, procedure, or event "may have caused" his injury conceivably could, as in *Holmes*, trigger the statute of limitations. As noted, *supra*, the key issue in any particular case is the plaintiff's degree of certainty regarding the cause of his injury. Indeed, a plaintiff who is ninety-five percent sure that a particular product or procedure caused his injury does not know the cause with *absolute* certitude. Rather, it may be said that such a plaintiff knows only that the procedure *may* have caused his injury. Such relative certainty would, nevertheless, undoubtedly trigger the statute of limitations, given that "absolute certitude" is not required under Ohio law. Thus, the critical inquiry, in this or any other case, is the point at which the plaintiff became sufficiently certain about the cause of the injury to trigger the statute of limitations. In its December 22, 1998, ruling, the Court rejected Sandoz' argument that the Plaintiff's reading of the Medview report supplied the requisite level of certainty, as a matter of law, and nothing in *Holmes* undermines the Court's confidence in its conclusion.[12]

12. Sandoz also cites *Kennard v. Burt*, Montgomery App. No. 12388, 1994 WL 484167 (Sept. 9, 1994) (unreported), in support of its Motion for Reconsideration. That case concerned the accrual of a cause of action against a hospital for the negligent credentialing of its physicians. In *Kennard*, the appellate court reasoned that the statute of limitations began running on the plaintiff's claim after her discovery that her doctor had performed disfiguring "love surgery" upon a number of other women. At that point, the court reasoned, the plaintiff reasonably should have been put on notice to question the hospital's credentialing practices.

In its Motion for Reconsideration, Sandoz reasons, by analogy, that the Plaintiff reasonably should have filed his lawsuit in 1991, after learning from the Medview report that a number of other Parlodel users had experienced physical problems like his wife's. The Court finds this argument unpersuasive. In short, the Court finds the causal link between the hospital's credentialing practices and the plaintiff's injury in *Kennard* more readily apparent than the causal link between Cheryl Yacub's injury and the drug Parlodel in the present case. In *Kennard*, the plaintiff knew the cause of her own injury (i.e., her doctor's unauthorized surgical procedure) from the outset. That one isolated incident, however, was insufficient to call into question the hospital's credentialing practices. Thus, the accrual of the plaintiff's negligent credentialing claim depended solely upon her discovery that a number of other women had been victimized by her physician's "love surgery" at the defendant hospital.

In the present case, the Plaintiff did not know the cause of his wife's injury. Furthermore, in its prior Decision and Entry (Doc. # 48), the Court recognized that the Medview report failed to provide the Plaintiff with the requisite level of knowledge. The report identified *three* potential causes for her injury, explaining how and why each one might have affected her health. Significantly, with respect to the occurrence of other adverse health problems similar to Cheryl Yacub's, the Medview report indicated that only 15 to 50 other women *nationwide* had experienced her symptoms after taking the drug. The Court

■ Sandoz makes two additional arguments, however, both of which warrant some discussion. *First,* it argues that even under this Court's December 22, 1998, reading of § 2305.10 and pertinent case law, the Plaintiff's cause of action accrued no later than November, 1991, when he received and read the Medview report. Specifically, Sandoz asserts that "[g]iven the information that Mr. Yacub received through the Medview report in November, 1991, he knew or reasonably should have known that Parlodel, as opposed to other causes, was the most likely proximate cause of Cheryl Yacub's injuries." (Doc. # 54 at 6–7). Based upon the Court's prior analysis of the Medview report, however, it simply disagrees with this conclusion. The Court discussed the contents of the Medview report at length in its December 22, 1998, ruling, and a significant portion of that analysis has been set forth, *supra.* Therefore, for the reasons discussed above, as well as those contained in the Court's prior ruling, Sandoz has failed to demonstrate that the Plaintiff's receipt of the Medview report commenced the statute of limitations, as a matter of law.[13]

*Second,* Sandoz contends that the Court's adoption of a new "most likely cause" standard violates Ohio public policy. This argument, however, is premised upon Sandoz' misperception that the Court's December 22, 1998, ruling represents a departure from existing Ohio law regarding § 2305.10 and the "discovery rule." In the Court's view, however, its prior ruling is entirely consistent with existing Ohio law, particularly as construed by the Sixth Circuit in *Cacciacarne,* by the Ohio Supreme Court in *Burgess,* and by the appellate courts in *Telakowicz v. John Bunn Co.,* Ashland App. No. CA–1024 (July 23, 1993) (unreported) (holding that the statute of limitations began to run on the plaintiffs' product liability claim once they "had their suspicions of causation confirmed"), and *Colby v. Terminix International Co.,* Stark App. No. 96–CA–0241 (Feb. 10, 1997) (holding that the statute of limitations begins to run in a product liability action when a plaintiff knows the cause of his injury, not when he suspects the

previously expressed its doubt that "these figures represent a large percentage of Parlodel users." (Doc. # 48 at 25). Consequently, given the relatively small number of prior incidents and the report's identification of two other potential causes, which also had led to health problems similar to Yacub's, the Court refused to find, as a matter of law, that the Medview report triggered the statute of limitations. Nothing in *Kennard* persuades the Court that its prior conclusion was erroneous, particularly in light of cases such as *Cacciacarne.*

13. Although the Court need not repeat its prior discussion of the Medview report in detail, it wishes to clarify one issue raised in Sandoz' Motion for Reconsideration. In a footnote, Sandoz argues:

The visual disturbance adverse reactions reported in association with Parlodel use was in the 1990 [Physician's Desk Reference] labeling for the medication, rather than in the text of the Medview report. The Court declined to consider this evidence, however, because '[t]he record contains no evidence that Yacub had been given a copy of the Physician's Desk Reference or even

knew of its existence.' Opinion at 14–15, n. 4. The Medview report, however, repeatedly refers to the PDR, lists the 1990 PDR Parlodel [sic] as an attachment to the report, and describes pertinent information contained in the PDR regarding Parlodel. Thus, Mr. Yacub should have been aware of the existence of the PDR and that it contained information relating to Parlodel and his wife's injuries.

(Motion for Reconsideration, Doc. # 54 at 7 n. 6).

The foregoing footnote suggests that the Court improperly refused to consider the contents of the PDR, based upon its erroneous determination that Mr. Yacub had no access to the information contained in the PDR. In reality, however, the Court's determination that "[t]he record contains no evidence that Yacub had been given a copy of the Physician's Desk Reference or even knew of its existence" plainly referred to Cheryl Yacub, prior to her death, and *not* to Mr. Yacub, the Plaintiff. In fact, the footnote at issue expressly referred to Cheryl Yacub by name and pertained to *her* access to the PDR prior to her death. The Court's reasoning had nothing to do with Mr. Yacub or his subsequent review of the Medview report.

cause). Consequently, the Court finds unpersuasive Sandoz' argument that its December 22, 1998, Decision and Entry (Doc. # 48) violates Ohio's public policy.

In a final argument, Sandoz asks the Court to bifurcate this litigation and to try the statute of limitations issue first. (Doc. # 54 at 10). In support of its request, Sandoz reasons:

> Bifurcation here will promote efficiency because the facts underlying the threshold statute of limitations issue are separate and distinct from those facts necessary to prove product defect, causation, and damages. Although a verdict in NPC's favor on this issue would not entirely dispose of the case, even plaintiff's counsel concedes the survivorship claim is a major part of this case. *See* Joint Motion to Vacate Trial Date, filed on or about Jan. 7, 1999, at 2. Presentation of complex scientific causation evidence simply would confuse the jury on the statute of limitations issue and would waste the resources of the court and the parties. Additionally, bifurcation of the statue of limitations defense would prevent undue prejudice to the defendant, particularly in a situation involving a sympathetic plaintiff. [Citation omitted]. NPC therefore respectfully submits that bifurcation is appropriate in this case.

(*Id.* at 11).

Upon review, the Court finds Sandoz' request to bifurcate the statute of limitations issue well taken, particularly given the Plaintiff's failure to interject any opposition.[14] It is well-settled that the decision to bifurcate a trial is within a District Court's sound discretion. *Saxion v. Titan–C–Manufacturing, Inc.,* 86 F.3d 553, 556 (6th Cir.1996). Additionally, as Sandoz properly notes, the Sixth Circuit has recognized that "separate trials on a statute of limitations issue are particularly

appropriate" when a decision on that issue would minimize court time and litigation expenses. *Yung v. Raymark Industries, Inc.,* 789 F.2d 397, 401 (6th Cir.1986). In the present case, Sandoz has represented to the Court that a separate trial on the statute of limitations issue would not only promote judicial economy, but also limit litigation expenses, avoid confusion of the issues, and prevent undue prejudice. (Doc. # 54 at 10–11). Given the Plaintiff's failure to make any argument to the contrary, Sandoz' *unopposed* request for bifurcation of the statute of limitations issue is granted. That issue will be tried prior to any of the other issues involved in this litigation.

Although the above-captioned cause is set for a fifteen-day jury trial, beginning on October 2, 2000, counsel should take note that a telephone conference call has been scheduled for Tuesday, August 31, 1999, at 5:45 p.m., to discuss the possibility of trying the statute of limitations issue at an earlier date.

14. The Plaintiff has failed to file a Memorandum opposing Sandoz' Motion for Reconsideration.