# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 29, 2021

Lyle W. Cayce
Clerk

No. 20-20215

Mari Leigh Oliver,

*Plaintiff—Appellee*,

*versus*

Benjie Arnold,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-3234

Before Wiener, Dennis, and Duncan, *Circuit Judges*.
James L. Dennis, *Circuit Judge*:

Mari Leigh Oliver brought suit against Benjie Arnold, her former Sociology teacher at a public high school in Texas, alleging that he violated her First Amendment rights by attempting to compel her to transcribe the United States Pledge of Allegiance and by retaliating against her after she refused. Arnold moved for summary judgment on the ground that qualified immunity protected him from liability. The district court denied the motion, finding that genuine factual disputes regarding Arnold's conduct and intentions precluded a finding that he did not violate any of Oliver's clearly established rights. Arnold filed this interlocutory appeal, and Oliver filed a

motion to dismiss the appeal for lack of jurisdiction. Because Arnold seeks to have this court resolve the very factual disputes that the district court found to be genuine and properly submitted for trial on the merits, which we do not have jurisdiction to do, we grant Oliver's motion and DISMISS the appeal.

## I.  FACTS AND PROCEDURAL HISTORY

### A. Background

As discussed in more detail below, we lack jurisdiction in an appeal of a denial of qualified immunity at the summary judgment stage to reexamine the evidence in the record to determine whether the factual disputes identified by the district court are genuine. *See Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir. 1998) (examining *Johnson v. Jones*, 515 U.S. 304 (1995), and *Behrens v. Pelletier*, 516 U.S. 299 (1996), in explaining that we lack jurisdiction in this context to consider whether "evidence could support a finding that particular conduct occurred" (quoting *Behrens*, 516 U.S. at 313)). Instead, we must look only to the district court's ruling, accepting as true the version of the purportedly disputed facts that is most favorable to the claims asserted by the plaintiff. *See id.* We therefore assume the following facts to be true while expressing no opinion as to whether they are fully supported by the evidence in the record, and we note that a wholly different version of events may ultimately be proven at trial.

Under Texas state law, public school districts must require students to recite the United States Pledge of Allegiance (the "Pledge") every school day. *See* TEX. EDUC. CODE § 25.082(b). However, the law requires schools to excuse any student from this obligation "[o]n written request from a student's parent or guardian." *Id.* at § 25.082(c). Klein Independent School District ("KISD")'s pledge policy tracks the Texas statute, and, absent a

written excuse from a parent or guardian, students are required to recite the Pledge each day.

Oliver is a young black woman who was enrolled as a student at Klein Oak High School ("Klein Oak") within KISD during the events that gave rise to this case. Oliver objects to the Pledge because she feels that the portion declaring America to be a nation "under God" fails to recognize many religions and does not match her personal religious beliefs. She further believes that, contrary to the words of the Pledge, there is not "freedom and justice for all" in America because she and other black people continue to experience widespread racial persecution. Oliver therefore declines to stand for or recite the Pledge.

During her time at Klein Oak, Oliver's refusal to participate in the Pledge led to a number of confrontations with KISD employees and her fellow students. On November 30, 2015, following one such conflict between Oliver and her Journalism teacher, Oliver's mother LaShan Arceneaux sent an email to the Klein Oak principal and guidance counselor that objected to the teacher "giving [Oliver] a hard time" for abstaining from the Pledge and asked that Oliver be transferred to a different class. The problems persisted, and approximately a year later, on November 14, 2016, Arceneaux sent a second email, this time to the Klein Oak principal and the KISD superintendent. The second email faulted the school for failing to stop the "harass[ment] of students who choose not to say the pledge." It further asserted that Oliver's "desire not to say the pledge is not an opinion, it is a constitutional right."

The following year, Oliver took Arnold's Sociology class. On August 18, 2017, the Klein Oak principal held a meeting with Oliver's teachers, including Arnold, and instructed them that Oliver was not required to participate in the Pledge. Nonetheless, on September 20, 2017, Arnold gave

the class an assignment to transcribe the words of the Pledge of Allegiance ("the Pledge assignment"). Although Arnold claims that the assignment had a pedagogical purpose, the district court found that his intentions were genuinely disputed, and we therefore must assume for purposes of this appeal that Arnold's justification was pretextual and Arnold intended the assignment as a mandatory statement of patriotic belief from his students. Oliver refused to complete the assignment and instead drew a "squiggly line."

During class the next day, Arnold told his students that anyone who did not complete the Pledge assignment would receive a grade of zero.[1] Arnold then engaged in an extended diatribe, which we must assume was aimed at Oliver and motivated by his hostility toward her refusal to transcribe the Pledge, in which he lamented what he viewed as the decline of American values and decried a variety of people whose attitudes he deemed to be un-American, including communists, supporters of Sharia law, foreigners who refuse to assimilate into American culture, and sex offenders and those that argue for their rehabilitation.[2]

> Your assignment yesterday was to write the Pledge. If you have
> a math class and that teacher gives you 10 problems to do, and
> you say you don't wanna do 'em, tell me what your grade is[.]
> It's a zero. And you have the option to do that, but what you've
> done is leave me no option but to give you a zero. And you can

---

[1] The district court twice stated that "[t]he parties dispute whether Arnold actually gave Oliver a zero" for failing to complete the Pledge assignment. The court then found that "a reasonable jury could conclude that Arnold . . . threatened to give a zero to anyone who refused to write the pledge (whether he acted on the threat or not)." From this language, it does not appear that the district court made any finding regarding whether Arnold actually gave Oliver a zero.

[2] Oliver made a surreptitious recording of Arnold's speech, and it is transcribed verbatim in the district court's memorandum opinion.

No. 20-20215

have all the beliefs, and resentment, and animosity that you want. But I made it clear yesterday: Writing it is not something you pledge. But again, but I know the sticker's gone—I used to have it, and it said "America, love it, or leave it." And if you can tell me two countries you'd rather go to[,] I will pay your way there if they're communist or socialist. Most of Europe is socialist and it's crumbling. Or it's communism. But if you ever come back you have to pay me twice what it cost me to send you there. You know there's a lot of things I complain about. So when it comes time in November I go vote, or I protest in writing, in legal. Those are the ways we do it in America. Where a country will crumble is when people coming into a country do not assimilate to that country. That doesn't mean you forget Day of the Dead, and whatever cultures[,] you maintain your language. That doesn't mean that. But you're not gonna drive on the left side of the road, and you're not gonna impose Sharia law. Because it's not. [T]his. [C]ountry. But what is happening, and I can say it a lot more than you because I've lived longer. It's almost as America's assimilating to THOSE countries.

Arnold's speech continued, discussing the Cuban Missile Crisis and the Pope's opposition to the construction of a wall at the United States' southern border before digressing into a discussion of a local sex offender in the news.

Okay, so keep you[r] house when the guy next to you has to put a sign out saying that he's a sex offender. And welcome him to the neighborhood. That's fine. And maybe that person needs that kind of welcome. And if you didn't hear in Houston, there was a—he was a Mariachi teacher. And the Principal[] also got removed. She hired him, but she was paying him out of a different account. Il[l]egal. The guy had about five counts of molestation, lewd exposure to young people, and there he was working in the school system. So you can say "Well, he needs a second chance[."] Tell that to the people that he abused. Tell that to those kids.

No. 20-20215

In the days that followed, Arnold continued to exhibit hostility toward Oliver and treat her more harshly than other students as a result of her refusal to transcribe the Pledge, including by repeatedly moving her seat, intentionally calling her by the wrong name, and making disparaging comments about her accomplishments in extracurricular activities. Although Arnold denies treating Oliver differently than other students and maintains that he enforced his classroom rules evenly, the district court again found that these facts are genuinely disputed, and we thus must assume that Arnold singled Oliver out for hostile mistreatment as a result of her opposition to the Pledge assignment.

In response to Oliver's complaints, the Klein Oak assistant principal and associate principal held another meeting with Arnold in which they reminded him of the August 2017 meeting in which he was informed of Oliver's right to abstain from the Pledge. The principals instructed Arnold to maintain neutrality in class discussions and to be sensitive to students' rights regarding the Pledge, and they told him to refrain from interacting with Oliver except as necessary. Arnold agreed to follow these instructions.

This agreement notwithstanding, hostilities between Arnold and Oliver continued to increase when, the following month, Arnold learned that Oliver had filed the initial complaint in the present lawsuit and named him among the defendants. Arnold authored a document in response entitled "The Truth Lies Herein," in which he set forth a renunciation of what he termed the "malicious accusations" and "trail of deception and blatant falsehoods" in Oliver's complaint.

Then, on November 1, 2017, Arnold played Christian music in class at the beginning of a unit on suicide and stared at Oliver continuously as the song played. Again, Arnold argues that there was a pedagogical purpose for the music and that he has played it and other music for all of his classes. But

again, the district court found that these facts are genuinely disputed, and we must assume that Arnold played the music as an expression of hostility toward Oliver. Oliver's counsel objected to the Christian music, and the assistant and associate principals met with Arnold a third time, this time reprimanding him for failing to follow the instructions he had agreed to and for violating state and local rules and ethical standards regarding religious neutrality.

## B. District Court Proceedings

Oliver filed her last amended complaint on December 11, 2019, adding those allegations recounted above that postdated her original complaint. Pursuant to 42 U.S.C. § 1983, Oliver asserted claims that Arnold had violated her First Amendment rights by attempting to compel her to transcribe the Pledge and by retaliating against her for her refusal to do so, including by giving her a zero on the assignment and giving a speech to the class that compared people who declined to say the Pledge to communists, supporters of Sharia law, and defenders of pedophilia.[3] Arnold filed a motion for summary judgment arguing that, as a government actor, he was entitled to qualified immunity.

On March 25, 2020, the district court entered a memorandum opinion denying Arnold's motion.[4] The court first noted that Oliver was not

---

[3] Oliver also asserted claims against a number of other KISD employees and the school district itself. The district court granted summary judgment to the other defendants on various grounds, and Oliver's separate appeal of these rulings is also currently pending before this court. *See Oliver v. Champion*, No. 20-20438 (5th Cir. 2020).

[4] Oliver had filed her own motion for summary judgment on her claims against Arnold, asking that the district court rule there was no genuine dispute that Arnold had violated her First Amendment rights and that he was not entitled to qualified immunity. In its memorandum opinion, the court also denied Oliver's motion. The court stated that whether Oliver was entitled to summary judgment was "a closer question" than with

challenging the facial constitutionality of TEXAS EDUCATION CODE § 25.082, and the district court therefore presumed the statute was constitutional and that it would not violate Oliver's First Amendment rights to require her to participate in the Pledge if her parent or guardian had not made a written request that she be exempted. The court then examined Arceneaux's two emails to school officials to determine whether they constituted effective requests to excuse Oliver from participating in the Pledge pursuant to TEXAS EDUCATION CODE § 25.082(c).

The court found that Arceneux's first, November 2015 email asking that Oliver be moved out of her Journalism class was not an effective written request because the email ultimately "propose[d] a course of action that did not specifically request exempting Oliver from participating in the pledge." However, the court determined that Arceneaux's second, November 2016 email was "clearly an effective exemption request" because it "effectively communicated to [school officials] that she, as Oliver's mother, wanted them to protect Oliver's constitutional right to abstain from the pledge." The court thus appeared to conclude that Arnold could not rely on TEXAS EDUCATION CODE § 25.082(c) as a defense because his alleged conduct occurred after Arceneaux's second email.

As to the merits of Oliver's claims against Arnold, the district court determined that, "the Supreme Court made it clear in 1943, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the First Amendment forbids compelling saluting or pledging allegiance to the flag." This precedent means, the district court explained, that for purposes of qualified immunity, "[a] public school student's First Amendment right to

---

respect to Arnold but concluded that "the full record at trial will provide a more secure basis for an accurate ruling." The district court's denial of Oliver's motion is not at issue in this appeal.

abstain from the Pledge of Allegiance is well, long, and clearly established." Similarly well established is the principle that "[a] school official engages in unconstitutional retaliation when, substantially motivated by a student's protected speech, the official takes actions causing an injury that would 'chill a person of ordinary firmness from continuing' the protected activity," the court continued, quoting *Brinsdon v. McAllen Independent School District*, 863 F.3d 338, 351 (5th Cir. 2017).

The district court then found that genuine disputes of fact existed regarding whether Arnold assigned transcription of the Pledge with the impermissible motive of requiring a statement of patriotism from his students, and the court therefore concluded that Arnold was not entitled to summary judgment on Oliver's compelled speech claim. The court further determined that "a reasonable jury could conclude that Arnold exhibited hostility toward, and retaliated against, Oliver for refusing to write the pledge, and that he threatened to give a zero to anyone who refused to write the pledge (whether he acted on the threat or not)." "A jury could also reasonably find that Arnold's speech to the class and threat to punish refusal to write the pledge with a zero would chill a person of ordinary firmness from exercising protected speech," the district court concluded, which precluded a grant of summary judgment on Arnold's claim for First Amendment retaliation. Arnold timely appealed.

## II. ANALYSIS

Government officials who are sued for money damages under § 1983 are entitled to qualified immunity from liability unless their actions violated a federal statutory or constitutional right and that right was clearly established at the time of their conduct. *Brinsdon*, 863 F.3d at 347. "Another articulation particularly for the school setting is that educators are entitled to qualified immunity unless no 'reasonable official' would have deemed the

No. 20-20215

disputed conduct constitutional." *Id.* (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). And while student's First Amendment rights "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), "[s]chool officials may only restrict . . . private, personal expression to the extent it would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' or 'impinge upon the rights of other students.'" *Swanson*, 659 F.3d at 375 (quoting *Tinker*, 393 U.S. at 509).

Thus, as the district court noted, the Supreme Court has held since the landmark 1943 decision in *West Virginia State Board of Education v. Barnette* that the First Amendment prohibits compelling students to salute or pledge allegiance to the American flag. "[T]he *Barnette* right to abstain from the pledge" is well established enough that our court has previously described a case in which it was violated as a "rare exception" to the trend "that educators are rarely denied immunity from liability arising out of First–Amendment disputes." *Morgan v. Swanson ("Swanson II")*, 755 F.3d 757, 760 (5th Cir. 2014) (citing *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir.2004)). It is also well established that a government official violates the First Amendment by retaliating against a person for exercising First Amendment rights—that is, by taking "adverse actions" that are "substantially motivated against the plaintiffs' exercise of constitutionally protected conduct" that cause the plaintiff "an injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity." *Brinsdon*, 863 F.3d at 351 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

This court generally reviews a district court's ruling on a motion for summary judgment *de novo*, applying the same standard as the district court. *Mack v. City of Abilene*, 461 F.3d 547, 555 (5th Cir. 2006). However, an exception to this general rule applies when a defendant appeals a denial of qualified immunity at the summary judgment stage. *See Colston*, 146 F.3d at 284. Although our review is still *de novo*, we are limited in what aspects of the district court's ruling we are permitted to review. *Id.*

A district court's finding that the evidence is sufficient to create genuine factual disputes is a preliminary ruling because the factual issues will ultimately be resolved at trial, and it therefore is not a final order over which 28 U.S.C. § 1291 grants us appellate jurisdiction. *See id.*; *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 290 (5th Cir. 2000). Nevertheless, qualified immunity is not "a mere defense to liability," but rather "an *immunity from suit*," and it would be effectively lost if a defendant were forced to defend at trial against allegations that would not overcome qualified immunity even if proven. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). A district court's decision that a given set of facts will overcome a defendant's qualified immunity if proven is therefore immediately appealable under the collateral order doctrine. *Id.* at 527 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545 (1949)).

The interaction of these two jurisdictional principles means that, when considering an appeal of a district court's denial of a defendant's summary judgment motion that asserts qualified immunity, we must accept that the evidence gives rise to the factual disputes identified by the district court, and we may only review whether the version of those facts that is most favorable to the plaintiff's claim is sufficient to overcome qualified immunity. *See Colston*, 146 F.3d at 284; *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) ("[W]e cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough

evidence in the record for a jury to conclude that certain facts are true." (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc))). Put another way, "[i]n deciding an interlocutory appeal of a denial of qualified immunity, we can review the materiality of any factual disputes, but not their genuineness." *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

While this appeal was pending before our court, Oliver filed a motion to dismiss the appeal and for attorneys' fees, arguing that Arnold's appeal was frivolous because the district court's ruling centered on factual disputes and this court lacks jurisdiction over interlocutory challenges to such determinations. Oliver is correct that the limits on our jurisdiction foreclose Arnold's arguments.

Foremost among Arnold's contentions on appeal are that the Pledge assignment had a legitimate instructional purpose and he did not intend it to instill or require patriotic belief, nor did he harass Oliver or treat her more harshly than her classmates because she refused to complete the assignment. However, what Arnold's motivations were, whether he engaged in the actions toward Oliver that she alleges, and how he treated other similarly situated students are all quintessential questions of fact. *See, e.g.*, *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) ("[A] party's state of mind is inherently a question of fact which turns on credibility. Credibility determinations, of course, are within the province of the fact-finder."); *Kinney*, 367 F.3d at 346 ("[T]he court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct.").

Arnold also repeatedly argues that Arceneaux did not submit a request that Oliver be excused from participating in the Pledge. To be sure, whether the text of the emails that the district court found Arceneaux sent constituted an effective exemption request under Texas Education Code

§ 25.082(c) is a question of statutory construction, which is a purely legal matter that would fall within our limited appellate jurisdiction. *See Kemp v. G.D. Searle & Co.*, 103 F.3d 405, 407 (5th Cir. 1997) ("Questions of statutory interpretation are questions of law and thus reviewed *de novo.*" (citing *Estate of Bonner v. United States*, 84 F.3d 196, 197 (5th Cir.1996))). But Arnold raises no arguments as to why Arceneaux's emails did not satisfy the statute, and arguments that are not raised on appeal are waived. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1045 n.7 (5th Cir. 1998).

Instead, Oliver contends that Arceneaux stated in a deposition that she never submitted an exemption request in writing because she thought the school knew that she approved of Oliver abstaining from the Pledge and because no school official had asked her for a written statement. But, as the district court concluded, "Arceneaux['s] . . . subsequent testimony does not negate the November 2016 email's legal effect under the Texas pledge statute." At best, the testimony creates a factual dispute over whether Arceneaux in fact sent the email in question, and, again, we lack jurisdiction to review the district court's factual determinations.[5] *See Trent*, 776 F.3d at 376.

---

[5] Arnold invokes our court's rule that we do "not allow a party to defeat a motion for summary judgment using an affidavit that impeaches without explanation sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). The copies of the emails Oliver submitted into evidence are neither affidavits nor impeachment evidence, but rather documentary evidence that bears directly on the question of whether Arceneaux submitted a written § 25.082(c) request. More fundamentally, however, whether we allow testimony to be impeached bears only on whether that testimony is true or not, which is a factual issue over which we lack jurisdiction. *See Int'l Shortstop, Inc.*, 939 F.2d at 1265 ("Credibility determinations, of course, are within the province of the fact-finder."). The district court found that Arceneaux sent the emails in question, and we must accept this determination. *See Colston*, 146 F.3d at 284. And because Arnold does not raise any cognizable challenge to the district court's ruling that Arceneaux submitted a valid

Arnold's legal arguments are inextricably intertwined with his challenges to the facts that the district court found to be disputed, over which we lack jurisdiction. He contends that Oliver's compelled speech claim fails because Arceneaux did not submit a § 25.082(c) request and Oliver was thus required by state law to participate in the Pledge; because the Pledge assignment was given for pedagogical purposes, and, under *Brinsdon v. McAllen Independent School District*, 863 F.3d 338 (5th Cir. 2017), it does not violate clearly established law to require a student to participate in the Pledge for didactic reasons; and, relatedly, because a refusal to complete a class assignment given for pedagogical reasons is not expressive conduct protected by the First Amendment. But, as we have stated, the district court found these facts to be genuinely disputed, and we must assume due to the posture of this appeal that Arceneaux did submit a valid § 25.082(c) request and that Arnold gave the Pledge assignment "for the purposes of teaching, fostering[,] and perpetuating the ideals, principles[,] and spirit of Americanism,"—the intent the Supreme Court found impermissible in *Barnette*. 319 U.S. at 625.

Similarly, Arnold argues that Oliver does not have a valid claim for retaliation because her refusal to complete the Pledge assignment was not constitutionally protected activity, because "the *evidence*" shows he did not harass her or treat her differently than other students, and because any adverse actions he took were not motivated by Oliver's refusal to complete the Pledge assignment. But, again, because the district court found these facts to be genuinely disputed, we must assume for purposes of this appeal that Arnold gave the Pledge assignment for impermissible purposes, rendering Oliver's refusal protected activity; that Arnold singled Oliver out and treated her differently than other students; and that these adverse actions

---

§ 25.082(c) request, we need not and do not consider how our analysis would differ had no request been submitted.

were motivated by hostility to Oliver's refusal to complete the Pledge assignment. *See Colston*, 146 F.3d at 284. We do not have jurisdiction to reexamine "the *evidence*" as Arnold urges. And Arnold raises no argument as to why, if he did engage in the actions toward Oliver that she alleges and he was substantially motivated by opposition to Oliver's refusal to complete the Pledge assignment, they nonetheless failed to cause Oliver "an injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity" *Brinsdon*, 863 F.3d at 351 (quoting *Keenan*, 290 F.3d at 258). And, again, arguments that are not raised on appeal are waived. *Hidden Oaks*, 138 F.3d at 1045 n.7.

Our dissenting colleague argues that Arnold simply gave an unconventional teaching assignment that no clearly established law prohibits. Dissent at 3. He further posits that, in holding that Arnold's conduct, if proven, would violate clearly established rights, we open the door for students to sue over any classwork they deem offensive. Dissent at 3-5. But the dissent fails to heed the limits on our jurisdiction in this context and to consider the facts in the light most favorable to Oliver. In this appeal, the "impure motive" we must assume Arnold had for giving the Pledge assignment is not simply "foster[ing] respect for the Pledge" as the dissent contends. Dissent at 3. Instead, because the district court found that Arnold's motives are genuinely disputed, we must presume here that Arnold was requiring his students to make precisely the sort of written oath of allegiance that the dissent acknowledges would be impermissible. Dissent at 3. We are not permitted to look beyond the district court's findings of disputed facts to conclude that, based on the evidence in the record, Arnold was instead merely employing a "curious teaching method." Dissent at 2.

The dissent also places much weight on the fact that what is at issue here is a "written assignment." Dissent at 1, 3. But the Court in *Barnette* stated, "If there is any fixed star in our constitutional constellation, it is that

no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess *by word or act* their faith therein." 319 U.S. at 642 (emphasis added). It is immaterial that, under the facts we must accept here, the required pledge was a written oath rather than an oral one and that the consequence for non-compliance was an academic penalty rather than an overt disciplinary action. *Barnette* clearly states that teachers and other school officials may not require students to swear allegiance, and with the case in this posture, we must assume that this is what Arnold did. Thus, there is no danger that our decision will pave the way for students to file lawsuits over their being required to study Dr. Suess or any of the other figures featured in the scenarios the dissent imagines. Dissent at 4-5. Unless a teacher is requiring students to swear their fealty and devotion to Dr. Suess and his teachings, the assignments the dissent envisions are clearly not implicated by the present case.

What remains is Oliver's motion for attorneys' fees for this appeal. We, of course, follow the "American Rule" under which "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 370 (2019) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253 (2010)). Oliver's motion itself identified no source of authority that would permit us to award attorneys' fees, though in the conclusion of her response brief she requests attorneys' fees "pursuant to 42 U.S.C. Section 1983." Although § 1983 itself does not authorize an award of attorneys' fees, 42 U.S.C. § 1988 provides that "[i]n any action or proceeding to enforce a provision of section[] . . . 1983 . . .of this title. . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." But Oliver makes no separate argument as to why an award of attorneys' fees is appropriate in this case, and "[t]he question of which party is entitled to fees

under Section 1988 'require[s] an inquiry separate from the decision on the merits.'" *Zimmerman v. City of Austin*, 969 F.3d 564, 568 (5th Cir. 2020) (quoting *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 451 & n.13 (1982)) (second alteration in the original).  In the absence of any specific argument regarding attorneys' fees, we decline to exercise our discretion to award them.

## III.    CONCLUSION

Based on the foregoing, Oliver's motion for attorneys' fees is DENIED.  Oliver's motion to dismiss the appeal for lack of jurisdiction is GRANTED, and the appeal is DISMISSED.

No. 20-20215

STUART KYLE DUNCAN, *Circuit Judge*, dissenting:

I respectfully dissent.

The law forbids a public school teacher from compelling students to recite the Pledge of Allegiance. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627, 642 (1943). But nothing like that is going on here. As part of an in-class exercise, a sociology teacher asked students to see if they could write the Pledge's words from memory. This assignment followed one where students would ponder the lyrics to Bruce Springsteen's "Born in the U.S.A." No case says this teaching method—unorthodox though it may be—violates the First Amendment. That is true whatever the teacher's motives for giving the assignment. So, we should dismiss this case based on qualified immunity now. The majority's contrary approach, which sends the case to trial, would make countless classroom assignments fodder for federal lawsuits whenever a student claims offense. Indeed, so far as I can tell, this is the first decision by any federal circuit permitting a student to challenge a written assignment as "compelled speech" under the First Amendment. We should not go down that road.

The genesis of Oliver's First Amendment claims was an assignment, repeated yearly, where Arnold would ask his sociology students to see if they could "transcribe the words of the Pledge of Allegiance" within a set time period. *Ante* at 4. The exercise was paired with another where the students would listen to, and then discuss, "Born in the U.S.A." The majority concludes the Pledge assignment implicates *Barnette*, which famously held that "the First Amendment prohibits compelling students to salute or pledge allegiance to the American flag." *Ante* at 10. The majority further holds that material fact disputes prevent our resolving Arnold's qualified immunity claim on interlocutory appeal—specifically, disputes over whether Arnold gave the assignment "for pedagogical purposes" or instead for the

18

"impermissible motive of requiring a statement of patriotism from his students." *Ante* at 14, 9. I disagree on both points.

Qualified immunity yields only where an official violates "clearly established law," meaning binding authority "that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc). But *Barnette* does not provide the "particularity" to settle Oliver's First Amendment claims. In *Barnette*, the Pledge figured in a distinct context: students were made to join in a "ceremony" where they stood and "salut[ed]" the American flag while reciting the Pledge. *Barnette*, 319 U.S. at 626–30 & n.2. By contrast, the Pledge assignment here involves nothing like *Barnette*'s coerced ceremonial recitation. Rather, the undisputed record shows students would "transcribe" the Pledge's words as part of a timed in-class exercise.

This is a curious teaching method, but no case cited to us addresses whether it violates the First Amendment. The majority mentions our *Barnette*-related decision in *Brindson*, *ante* at 14, but that case addressed a mock exercise where students had to "mimic the pledge ceremony that Mexican citizens follow" by reciting the Mexican Pledge of Allegiance and singing the Mexican National Anthem. *Brindson v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 343 (5th Cir. 2017). Like *Barnette*, *Brindson* involved a coerced pledge recitation, not an assignment where students write a pledge's words.

The majority concludes we lack jurisdiction to decide this issue because of disputes about Arnold's motives for giving the assignment. *Ante* at 14–15. Like the district court, it relies on an in-class monologue Arnold gave the day after the assignment—a stream-of-consciousness rant ranging from the Pledge to communism, the Pope, the Cuban Missile Crisis, sex offender laws, and the Day of the Dead (the Mexican holiday, not the zombie movie). *Ante* at 4–6. This appeal being interlocutory, I assume a jury could

therefore infer that Arnold gave the assignment hoping to inculcate respect for the Pledge. *See*, *e.g.*, *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (on interlocutory appeal of qualified immunity denial, "[w]e lack jurisdiction to review the *genuineness* of the factual disputes the district court identified"). But nothing prevents us from deciding whether that dispute is *material* to qualified immunity. *See id.* ("We may of course decide whether the factual disputes the district court said were material are in fact material.") (citing *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc)). I fail to see how it is.

Let's assume Arnold had an impure motive for giving the Pledge assignment. What decision clearly establishes that, because of that motive, he violated the First Amendment? Indeed, what decision says that asking students to *write down words as part of a class exercise* constitutes "compelled speech" in the first place?[1] To be sure, one can conjure up a scenario where a teacher makes students "swear allegiance" to the flag through a written oath. But no one pretends that is the situation here.[2] Even if Arnold hoped

---

[1] *Cf. Wood v. Arnold*, 915 F.3d 308, 318–19 (4th Cir. 2019) (assignment asking history students to list the "Five Pillars" of Islam "did not require [the plaintiff student] to profess or accept the tenets of Islam"); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 187 (3d Cir. 2005) ("A student may . . . be forced to speak or write on a particular topic even though the student might prefer a different topic."); *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) (declining to adopt a First Amendment standard that would "effectively give each student veto power over curricular requirements, subjecting the curricular decisions of teachers to the whims of what a particular student does or does not feel like learning on a given day"); *see also, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, --- S. Ct. ---, 2021 WL 2557069, at *8 (U.S. June 23, 2021) (Alito, J., concurring) ("In a math class, for example, the teacher can insist that students talk about math, not some other subject.").

[2] *See*, *e.g.*, *Torcaso v. Watkins*, 367 U.S. 488, 491 & n.4 (1961) (discussing tender to Lord Baltimore by the Colony of Virginia of the "oaths of supremacy and allegiance," and recounting that Baltimore, "who making profession of the Romish Religion, utterly refused to take the same"). One can also imagine a written classroom assignment so contrary to a

to foster respect for the Pledge, that does not make him a latter-day Henry VIII.

Finally, consider the implications of the majority's approach. It sends to trial a § 1983 claim based on a student's objection to a written assignment, merely because there is a question about the teacher's motive for giving it. One can imagine where this approach, if taken in a precedential opinion, might lead. It is not a happy place.

We live in an easily offended age. Even Dr. Seuss is controversial.[3] Suppose, for instance, a teacher asks students to memorize and write down these well-known passages:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed[.]

---

student's religious beliefs that making him do it would violate the Free Exercise Clause— for instance, an assignment to write the words, "Jesus was not the Son of God" or "Praise be Quetzalcoatl." *See, e.g.*, Christopher F. Rufo, *Revenge of the Gods* (discussing a proposed "ethnic studies curriculum" in California that "urges students to chant to the Aztec deity of human sacrifice"), https://christopherrufo.com/revenge-of-the-gods/ (last visited June 24, 2021). Again, we do not have anything like that here.

[3] *See* Seussville.com (reporting Dr. Seuss Enterprises' "decision . . . to cease publication and licensing of the following titles: *And to Think That I Saw It on Mulberry Street*, *If I Ran the Zoo*, *McElligot's Pool*, *On Beyond Zebra!*, *Scrambled Eggs Super!*, and *The Cat's Quizzer*" because "[t]hese books portray people in ways that are hurtful and wrong"), *available at* https://www.seussville.com/statement-from-dr-seuss-enterprises/ (last visited June 24, 2021). *See also* Philip Nel, Was the Cat in the Hat Black? The Hidden Racism of Children's Literature and the Need for Diverse Books 32 (2017) ("The Cat in the Hat is . . . racially complicated, inspired by blackface performance, racist images in popular culture, and at least one real African American.").

No. 20-20215

UNANIMOUS DECLARATION OF THE THIRTEEN UNITED STATES OF AMERICA (July 4, 1776). The words teem with occasions for offense: they are arguably sexist ("Men") and religious ("Creator"), and were written by a notorious slaveholder. What if there were evidence the teacher gave the assignment to inculcate respect for Thomas Jefferson? Lawsuit.

Or suppose a teacher, hoping to pass on the legacy of Dr. Martin Luther King, Jr., asks students to transcribe his most famous speech, which contains this passage:

> I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character.

MARTIN LUTHER KING, JR., I HAVE A DREAM: ADDRESS TO THE MARCH ON WASHINGTON FOR JOBS AND FREEDOM (Aug. 28, 1963). Today, this aspiration of colorblindness has come under fire.[4] May an offended student sue the teacher for being asked to copy Dr. King's words? Under the majority's approach, yes.

I respectfully dissent.

---

[4] *See*, *e.g.*, IBRAM X. KENDI, HOW TO BE AN ANTIRACIST 10 (2019) ("The language of color blindness . . . is a mask to hide racism."); Cornel West, *Foreword* to MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS x (2010) ("In fact, the very discourse of colorblindness . . . has left America blind to the New Jim Crow.").