# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2022

Lyle W. Cayce
Clerk

No. 20-30731

Todd Phillips; Jodi Phillips; Brooke Phillips; Abby Phillips,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

Julian C. Whittington, *individually and in his official capacity as Sheriff of Bossier Parish*; Bruce Bletz, *in his individual capacity*; Shawn Phillips, *the supervisor of the investigation division , in his individual capacity*; Charlie Owens, *Former Chief Deputy, supervisor of day-to-day operations and adviser to Sheriff Whittington, in his individual capacity*,

*Defendants—Appellants/Cross-Appellees*,

Hugo A. Holland, Jr., *individually and in his official capacity as Special Prosecutor for the Bossier Parish District Attorney's Office*; J. Schuyler Marvin, *in his official capacity as District Attorney for Bossier Parish*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:17-CV-1524

Before King, Graves, and Ho, *Circuit Judges*.

Per Curiam:[*]

This interlocutory appeal and cross-appeal arise from 42 U.S.C. § 1983 claims filed by the Phillips family against Bossier Parish police officers and district attorneys who were involved in the arrest of Todd Phillips for two acts of arson. The defendants sought summary judgment based on qualified immunity, which the district court granted in part and denied in part. Now, the defendants appeal that denial of summary judgment on the Phillipses' false-arrest claim and the Phillipses cross-appeal the grant of summary judgment on various other claims. For the reasons discussed, we affirm the district court's judgments that the Phillipses challenge on cross-appeal and dismiss the defendants' interlocutory appeal for lack of jurisdiction.

## I. Factual and Procedural Background

Todd Phillips was arrested for two arsons, but these two arsons were a small part of a broader crime spree in Bossier Parish, Louisiana. To fully understand the claims at issue, we must review the full scope of the original crime spree and the state's case against Todd, which culminated in a five-day 404(b) evidentiary hearing.

### A. The Crime Spree and Initial Investigation

Todd and his family moved to Benton, Bossier Parish, Louisiana, around 2004.[1] The Phillipses purchased 28 acres on Old Plain Dealing Road, which were heavily wooded and contained a barn and pasture for their horses. Beginning in 2010 and continuing over the next eight years, a series of property crimes directed against hunters occurred near the Phillipses' home.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

[1] The district court states the family's move occurred in 2004, but the Phillipses themselves believe it was in 2005. For our purposes, the precise timing is irrelevant.

No. 20-30731

These crimes included over 60 documented incidents of theft, vandalism, arson, and property damage by gunfire.

The perpetrator had a recognized modus operandi. He would frequently use homemade spikes to pop the tires of vehicles, and burn down or steal from deer camps, deer stands, and camp houses. The perpetrator would also leave behind or mail various threatening letters to locals, police, and attorneys involved with this case. Finally, the perpetrator would plant evidence at crime scenes apparently to frame local residents.[2] The consistent practices led the Bossier Parish Sheriff's Office ("BSO") to conclude that all acts were completed by the same person.

In September 2011, the BSO appointed Lt. Bruce Bletz as the lead investigator for the case. Lt. Bletz began to use Gary Wilson as his confidential informant, and the two communicated regularly. The BSO now believes that Wilson was the real perpetrator of these crimes, and state charges are currently pending against him; but at the time of the initial investigation, Lt. Bletz believed Wilson to be another victim of the crime spree. Wilson would feed Lt. Bletz information that he claimed to have heard throughout the community about potential suspects.

On October 24, 2012, two deer stands were burned down. At the scene of those stands, a Coleman fuel bottle was left behind with "Todd Phillips"

---

[2] For example, at the scene of an October 2010 theft, a hammer with the initials of a local, Larry Coker, was left behind on the property—the police, however, did not suspect Coker. At the scene of a December 2010 spike planting, a shirt and walkie-talkie were left behind with the name of a different local, Landon Burns, written on the shirt—that local was cleared. In June 2011, a town resident received an anonymous call claiming a third local, Gregory Bickham, was responsible for the various acts and hid the stolen property at his home—but the BSO executed a search warrant for Bickham's home, found no stolen property, and cleared him. And in September 2011, a cell-phone box belonging to a fourth local, Billy Joe Fletcher, was left behind at the scene of an arson—the BSO investigated Fletcher and determined he was not a suspect.

written on its side in large letters. Then, on November 12, 2012, another deer stand, owned by Matt Caston, was burned down. Caston had a small GPS device at his deer stand, which the perpetrator stole. On that same night, at another nearby deer stand, the BSO found an incendiary device made from a grape Powerade Zero bottle filled with red diesel fuel, a veterinary bute syringe[3] with the name "Phillips" written on the syringe's label, and a blue plastic bag of trash later traced to the Phillipses' home.

With this new lead in hand, the BSO obtained a search warrant for the Phillipses' home. The search revealed nothing of evidentiary value. But the officers were able to interview Todd, his wife Jodi, and two of their daughters. The Phillipses recognized the bute paste as likely their own, but could not recall whether they had thrown it out at a rodeo the previous weekend or brought it home; they also recognized the trash. The Phillipses reported that they place their trash for pick up alongside Old Plain Dealing Road, approximately 0.3 miles away from their house. Soon after, Todd provided his fingerprints, DNA, and handwriting exemplars to the police.

A few days after the BSO executed its warrant, a neighbor came up to Jodi in her driveway. He said he found a GPS device in the bed of his truck that was parked near the Phillipses' property line and thought it may be theirs. Jodi contacted the BSO about the GPS, and the police eventually picked it up in late December 2012—but not until Lt. Bletz learned about the GPS from Wilson. The GPS was identified as Caston's.

Also during December 2012, various anonymous calls were made from a pay phone in Bossier City, Louisiana. Two are of particular note. The first call occurred on December 14 and was made to the crime-stoppers hotline. That caller accused one of the Phillipses' neighbors, Blake Barton,

---

[3] Bute paste is an anti-inflammatory pain-relief drug given to horses.

of the crime and stated that supporting evidence could be found at Barton's home. The BSO searched Barton's home and identified tire spikes as well as a bag of trash that had a magazine with a subscription label for Jodi Phillips. The second call occurred on December 24 and was directed to Barton's stepfather; it warned that Barton needed to leave town or else his trailer would be burned down.

In January 2013, based on the evidence pointing to Todd, Lt. Bletz obtained a warrant to place a GPS on Todd's vehicle. Despite tracking the vehicle from January 14, 2013, through April 19, 2013, the GPS data never showed the vehicle at or near any property crimes that occurred during that timeframe. Lt. Bletz subpoenaed the phone records of the Phillipses. The phone records identified that a cell tower pinged Jodi in the general area of the pay phone used to make the December 24 call.

Lt. Bletz continued to suspect that Todd was responsible for the crime spree. The theory was that Todd decided to frame himself in order to clear his name. Alternatively, Lt. Bletz testified that Todd had intended to burn the trash and syringe left behind on November 12, but rain had put the fire out. So, in March 2013, Lt. Bletz placed three white posters with bible verses along Old Plain Dealing Road across the street from the Phillipses' residence. The alleged intent of the posters was to coerce Todd into further acts.

In June 2013, Lt. Bletz consulted with other members of the BSO and the local district attorney to determine whether they could file charges against Todd. The district attorney advised that there was not sufficient evidence to formally charge Todd.

The perpetrator continued to commit crimes from 2013 through 2014—he shot and killed dogs, shot cars and houses, continued to plant spikes, vandalized homes, and left nails on the driveway of one of the Phillipses' neighbors. The perpetrator also continued to send threatening

letters, now often insulting Lt. Bletz. Lt. Bletz continued to suspect Todd and told members of the community of his suspicions. Concerned for their safety, the Phillipses moved approximately sixty miles away to Marshal, Texas.

The crime spree continued. In March and June of 2015, a BSO detective and subordinate of Lt. Bletz, Mike Lombardino, investigated a vandalism and burglary and concluded that Wilson was the probable perpetrator of both. He advised Lt. Bletz of his conclusion, but Lt. Bletz said Wilson was cleared and told the detective to mark those cases inactive. Lombardino reported Lt. Bletz's apparent blind spot to Captain Shawn Phillips, but nobody at the BSO disclosed these incidents to the district attorney. (Capt. Phillips has no relation to the plaintiffs.) Also in spring of 2015, Assistant District Attorney Hugo Holland ("ADA Holland") was brought onto the case.

In July 2015, Lt. Bletz was tasked with preparing the narrative supplement that accused Todd of simple criminal damage to property based on the placing of tire spikes. The report documented dozens of incidents from the broader crime spree, but it did not include incidents that could be read to exculpate Todd—such as the perpetrator framing a different local before Todd, the March and June 2015 incidents where Wilson was the prime suspect, and several incidents where Todd had an alibi. Lt. Bletz and Wilson continued to frequently communicate, and Lt. Bletz repeatedly told Wilson that he believed Todd to be the perpetrator of the crimes.

In August 2015, ADA Holland sent a plea deal to Todd that offered that Todd plead guilty to simple damage to property and pay $59,578.00 in restitution. Todd declined, and thus, on September 14, 2015, Capt. Phillips issued a citation to Todd for a misdemeanor charge of simple criminal property damage under LA. REV. STAT. § 14.56. Acknowledging that the state could not rely on direct evidence to support its charge, ADA Holland

No. 20-30731

filed a notice of intent to introduce evidence of the approximately 60 other crimes under rule 404(b); an evidentiary hearing to consider that 404(b) evidence was scheduled for November 28, 2016. All the while, the threatening letters continued: Todd's attorney received an envelope warning, "U R asking 2 many ?" and stating, "We R Untouchable Better Make Phillips C the Light."

## B. State Proceedings

As scheduled, the 404(b) hearing began on November 28, 2016. The hearing lasted five days and involved the testimony of over 30 witnesses. The state's key witness was Lt. Bletz.[4]

The Phillipses allege that Lt. Bletz made various false statements during his testimony. Regarding the Powerade bottle that was a part of an incendiary device, Lt. Bletz reported both that Todd identified the bottle as his own and that only Todd would have been able to identify the bottle due to its charring. In fact, the Powerade bottle could be identified clearly by any viewer, and the Phillipses reported that Todd did not purchase that bottle, but rather, drank Gatorade. Lt. Bletz testified that the failed incendiary device was put out by rain due to a hole in the deer stand's roof, but, according to Caston, that deer stand never had a roof. Regarding Todd's motive, Lt. Bletz testified that Todd was aggravated at the suggestion that the crimes were completed by kids and not a "highly intelligent, motivated adult with a . . . deep-seeded hatred for hunters," when in actuality, Todd did not so react. He testified that he discussed placement of the three signs outside of the Phillipses' home with the district attorney and a psychologist prior to placing them; however, he placed them without such consultations.

---

[4] Other witnesses included the Phillipses, Wilson and his son, various victims, and expert testimony regarding handwriting, cell phones, and incendiary devices.

He reported that the Phillipses told him that they "fundamentally disagreed with hunting," when in fact they expressed support for hunting. He reported that the Phillipses told him it was impossible for someone to access their property without them knowing due to the attentive, aggressive nature of their guard dogs; but the Phillipses stated it could be possible for someone to access their property without their knowing and that their dogs were not guard dogs, but family pets. Lt. Bletz also stated Todd had told him that the Coleman fuel bottle was likely his, but Todd did not say that.

Plaintiffs also allege that Lt. Bletz falsely testified as to the conclusions of the handwriting expert and cell-phone-records expert. Regarding the handwriting, Lt. Bletz claimed the handwriting expert found an "obvious anomaly" in Todd's exemplar—in fact, the expert concluded there was no intent to deceive within the exemplar but there were attempts to deceive in the writings found at the crime scenes. Regarding the cell-phone records, Lt. Bletz reported that the cell towers placed Todd's phone at the pay phone, but in actuality the expert identified the phone as Jodi's, and the tower could place her only in the general vicinity. They further allege that Lt. Bletz purposefully excluded various pieces of exculpatory evidence from his narrative report and testimony, such as incidents that fit into a pattern of the perpetrator framing local residents, incidents where Wilson was the prime suspect, and incidents that occurred where Todd had an alibi.

Unbeknownst to the plaintiffs and the state court, and while the state court was ruling on the 404(b) hearing, the crimes were escalating. In January 2017, a booby trap was set up to harm BSO deputies. At the advice of Wilson, Todd's friend was identified as the suspect. The BSO created a task force to determine whether that friend was the perpetrator of the crime spree. The task force was soon disbanded—though not until after the task force consulted with ADA Holland, and ADA Holland advised the task force that he did not need more evidence to convict Todd of the crimes.

No. 20-30731

In May 2017, the state court issued its opinion. It concluded that the vast majority of the crimes could not be considered as evidence against Todd, but it found five incidents could. Relevant to the instant case is the admissibility of the November 12, 2012, arsons. The court found that the prosecution proved Todd committed those acts by a preponderance of evidence. The court found compelling the GPS entering the Phillipses' property and the testimony of Lt. Bletz regarding the "attentive and protective dogs" on the property that would prevent intruders from accessing it. So, "[c]onsidering the consistent pattern of motive, opportunity, intent, preparation, plan and knowledge of [Todd] and the method by which his objectives were carried out, the Court [was] satisfied that the State ha[d] met it[s] burden and proven by a preponderance of the evidence that this incident should be admissible."

In August 2017, ADA Holland sought a warrant to arrest Todd for the November 12 arsons. The arrest warrant was not supported by an affidavit, but rather, was premised on "the entirety of the evidence adduced at the previous 404([b]) hearing which the state avers is more than sufficient to establish probable cause to believe the defendant committed" the offense of "intentionally damag[ing] the deer stands belong[ing] to Gary Wilson and Matthew Caston by setting fire thereto." The state court issued the warrant without further reasoning, and the jury trial was ultimately set for May 29, 2018.

In the fall of 2017, the perpetrator began sending threatening letters to schools, churches, and businesses that claimed Todd was framed and Lt. Bletz committed perjury, among other things. So, despite the pending trial, the chief deputy of the BSO wanted to re-examine the case. He created a task force, now excluding Lt. Bletz, and the task force identified Wilson as the sender of the letters and thus the likely perpetrator of the crimes. The

No. 20-30731

state brought charges against Wilson in February 2018; and in March 2018, the state dropped the charges against Todd.

## C. Federal Proceedings

On November 20, 2017, the Phillipses filed the instant case against BSO officers Lt. Bletz, Capt. Phillips, Sheriff Julian Whittington, Chief Deputy Charlie Owens (collectively, the "BSO Defendants"); ADA Holland, District Attorney J. Schuyler Marvin (collectively, the "DA Defendants"); and Gary Wilson and the estate of Coty Wilson.[5] As ultimately amended, the Phillipses alleged sixteen causes of action against the defendants. Relevant to this appeal are the claims under 42 U.S.C. § 1983 for false arrest, failure to intervene, failure to maintain adequate evidentiary practices, failure to adequately supervise, failure to disclose exculpatory evidence, and a state law claim for malicious prosecution. After motion practice and discovery, the BSO Defendants moved for summary judgment, while the DA Defendants moved to dismiss for failure to state a claim and partial summary judgment. The district court granted summary judgment to the defendants on nearly all these claims; however, it denied summary judgment as to the Phillipses' false arrest claim against Lt. Bletz.

After the court issued its opinions, the BSO Defendants sought an interlocutory appeal regarding the court's rejection of Lt. Bletz's qualified immunity defense. The Phillipses then sought entry of judgment under Federal Rule of Civil Procedure 54(b) and cross-appealed various grants of

---

[5] After charges were filed against Wilson, his wife (Jennifer Wilson) and son (Coty Wilson) died together in what appeared to be a joint suicide. *Coroner Concludes Mother and Son Died in Joint Suicide Plunge*, KTBS 3 (Apr. 25 2018), https://www.ktbs.com/news/3investigates/coroner-concludes-mother-and-son-died-in-joint-suicide-plunge/article_1fe50bfa-489f-11e8-9bb6-f714dc817e4f.html.

summary judgment for the BSO and DA Defendants. We address these in turn.

## II. The BSO Defendants' Appeal

The Phillipses submitted that Todd was subjected to an unconstitutional arrest in 2017 because the arrest warrant was based on the false statements of Lt. Bletz. The district court concluded that the Phillipses presented sufficient evidence to create a genuine dispute of material fact as to whether Lt. Bletz intentionally lied or recklessly disregarded the truth in his narrative report and testimony, and thus, reserved for trial whether Todd was subjected to a violation of his rights under the Fourth Amendment. The court further determined Lt. Bletz was not entitled to qualified immunity at the summary judgment stage because (1) he may have intentionally or recklessly made false and misleading statements in support of the arrest warrant; and (2) those statements may have been necessary for the warrant issuer to find probable cause. As to the other defendants, however, the court found that the Phillipses could not state a claim because they failed to put forward any evidence to show that those other officers engaged in any intentional or reckless untruthful conduct.

When a defendant appeals a denial of qualified immunity at the summary judgment stage, we review that decision de novo. *Oliver v. Arnold*, 3 F.4th 152, 160 (5th Cir. 2021). That said, we are limited in what aspects of the ruling we may review. *Id.* "[W]e must accept that the evidence gives rise to the factual disputes identified by the district court, and we may only review whether the version of those facts that is most favorable to the plaintiff's claim is sufficient to overcome qualified immunity." *Id.* In other words, the district court's conclusions regarding whether a genuine dispute exists are final, and we may review only whether that genuine dispute is material.

No. 20-30731

The BSO Defendants appeal the denial of summary judgment as to the Phillipses' false arrest claim and argue that Lt. Bletz is entitled to qualified immunity. The qualified immunity inquiry has two prongs: (1) "whether the officer's alleged conduct has violated a federal right" and (2) "whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc). In the context of a false arrest claim, it is clearly established that a constitutional violation occurs, even if an independent magistrate approves a warrant application, when "(1) the affiant, in support of the warrant, includes 'a false statement, knowingly and intentionally, or with reckless disregard for the truth,' and (2) the allegedly false statement is necessary to the finding of probable cause." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quoting *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018)).[6] Likewise, an officer may not omit exculpatory information that would preclude a magistrate from viewing all facts material to a finding of probable cause. *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006).

First, the BSO Defendants contend that the district court erred by finding that the Phillipses created a genuine dispute of fact as to whether Lt. Bletz knowingly or recklessly made false statements. At most, they contend, Lt. Bletz negligently made such statements. But that argument engages in precisely the sort of reweighing of facts that we are forbidden to engage in at this interlocutory stage, *Oliver*, 3 F.4th at 160; so, we lack jurisdiction to consider the argument.

---

[6] On the other hand, if the statements were not necessary to the finding of probable cause, there is no constitutional violation at all. *Id.* at 898.

Second, the BSO Defendants argue that the district court erred by finding that Lt. Bletz's alleged false statements were material to a finding of probable cause to support the 2017 arrest warrant for Todd Phillips. They argue that even if the hearing record is stripped of Lt. Bletz's allegedly false statements and includes his allegedly fraudulent omissions, there would still be probable cause to support Todd's arrest for arson, and thus, those statements and omissions were immaterial. But we agree with the district court that the materiality of these statements is dependent on the resolution of various factual disputes, and the resolution of such disputes must be reserved for trial.

When ruling on a summary judgment motion sounding in qualified immunity, like in any case, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Factual disputes ordinarily are not a problem when reviewing a warrant for probable cause: the court simply strikes the statements determined to be false from the warrant's supporting affidavit and then reviews whether the affidavit's remaining facts still support finding probable cause. *E.g.*, *Davis v. Hodgekiss*, 11 F.4th 329, 333-34 (5th Cir. 2021). Similarly, where an affiant omits exculpatory evidence, courts "insert the omitted facts into the affidavit and ask whether the reconstructed affidavit would still support a finding of probable cause." *Kohler*, 470 F.3d at 1113. If so, then the officer's statements were not necessary, and there was no constitutional violation.

The problem with the instant case is that there is no underlying affidavit. Rather, the state supported its application for a warrant "[b]y reference" to "the entirety of the evidence adduced at the previous 404([b]) hearing which the state avers is more than sufficient to establish probable cause to believe the defendant committed this offense." Thus, the district

court concluded that the facts were not easily reviewable and that it could not conclude as a matter of law that probable cause still exists.

The district court's logic is sound. The clearly established law here is that an officer may not make false statements to the magistrate judge to establish probable cause. *Arizmendi*, 919 F.3d at 897. It follows that if the court would need to resolve questions of fact to determine whether the false statements were necessary to the probable cause finding, then summary judgment must be denied.

The 404(b) hearing included the competing testimonies of dozens of witnesses, but Lt. Bletz was the state's primary witness, the primary proponent of Todd's guilt, and the bolstering force for non-testimonial evidence against Todd. The state court weighed Lt. Bletz's testimony and ultimately credited it over the testimony of others when the court made its 404(b) admissibility determinations. So, finding that Lt. Bletz testified falsely would also undermine the remaining evidence that supports probable cause for the arrest. As a relevant example, Lt. Bletz testified that the Phillipses' dogs prevented a stranger from entering their property and that Todd confirmed ownership of both the green Coleman fuel bottle and the purple Powerade bottle; if it is found that those statements were false, that physical evidence loses much of its probative value. Assuming those statements were false, the district court must reweigh the remaining evidence and make new credibility determinations to make an informed probable cause determination—and these are questions reserved for trial.

Lt. Bletz's allegedly fraudulent omissions of exculpatory evidence compound this problem. Whether these events were inappropriately excluded depends on genuinely disputed facts. The Phillipses highlight up to fifteen incidents where Todd had an alibi, which, if all were admitted, would exculpate Todd given the BSO's understanding that all the crimes were

committed by the same perpetrator. But it would take factual determinations regarding Lt. Bletz's knowledge to determine whether he improperly excluded them.[7] Thus, the appropriate course is to send the issue to trial.

The need for a trial is made clear by reviewing the state court's justification for finding the November 2012 arsons admissible against Todd. The state court credited three pieces of evidence. First, it credited Caston's testimony about the GPS. Caston's testimony "established [that] the GPS left his now burned deer stand, made its way to the road and traveled directly to the property of Phillips. He further detailed it traveled up the driveway and moved about extensively over the Phillips property." Specifically, Caston testified that the perpetrator took the GPS at the deer stand, turned the GPS on, and traveled down Old Plain Dealing Road to the Phillipses' driveway. Once there, the holder of the GPS stopped at the end of the driveway, walked in several circles, moved up the driveway, made several more circles, and then turned the GPS off. Second, the state court credited the attentive and protective nature of the dogs at the Phillipses' home, as testified to by Lt. Bletz, which persuaded the court "that others could not come on to the property and move around extensively on the property without being detected by man or beast." Finally, it credited "the consistent pattern of motive, opportunity, intent, preparation, plan and knowledge of Phillips and the method by which his objectives were carried out[.]"

Striking Lt. Bletz's allegedly false statements, the second and third supporting pieces of evidence are lost. Without Lt. Bletz's testimony about the dogs, it is no longer clear that someone would have difficulty entering the Phillipses' property, as several witnesses testified that they were able to enter

---

[7] For instance, Lt. Bletz explained why he excluded one incident but not the fourteen others. Factual determinations about the legitimacy of the exclusions must be made for each incident.

the property and that the dogs were not aggressive. *Cf. Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990) (noting as a relevant distinction for the purposes of probable cause that an officer mislabeled "guard dogs" as "attack dogs"). Todd's motive and intent also are dependent on disputed portions of Lt. Bletz's testimony, as it was Lt. Bletz who testified that Todd disdained hunters and offered a negative psychological profile of Todd.

All that remains is the stolen GPS that entered the Phillipses' property. The court acknowledged there were two theories offered at the 404(b) hearing regarding the GPS: (1) the perpetrator was attempting to frame Todd; or (2) Todd had turned the GPS on and tracked himself. The state court found the latter more persuasive. But that finding may be undermined based on what exculpatory evidence is added and what current evidence is removed. For instance, several omitted incidents include the perpetrator attempting to frame other people and crimes for which Todd had an alibi. If it is found that those incidents, among others, were fraudulently omitted by Lt. Bletz, a court may instead find the former theory more persuasive. But this depends on questions of fact, and thus, cannot be determined at summary judgment.

In conclusion, the district court properly denied summary judgment because any finding regarding whether probable cause could still exist once Lt. Bletz's false statements are removed, and improperly omitted evidence is included, depends on the answers to genuinely disputed questions of fact. *Tolan*, 572 U.S. at 656 ("[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986))); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 481–82 (5th Cir. 1999) ("[B]ased on the present disputed state of factual development, it is not now possible to conclude as a matter of law . . . that [the officer] acted in an objectively reasonable manner in arresting [the

plaintiff.]"). The district court correctly analyzed the issue, and so, we must dismiss the interlocutory appeal. *See Oliver*, 3 F.4th at 162 (explaining that a court must dismiss an interlocutory appeal where the appellants' "legal arguments are inextricably intertwined with his challenges to the facts . . . over which we lack jurisdiction").

Finally, the BSO Defendants challenge the surviving *Monell* claim arguing that there is no constitutional violation on which the *Monell* claim could lie. *Piotrowski v. City of Hous.*, 237 F.3d 567, 578–79 (5th Cir. 2001) (explaining that a *Monell* claim cannot exist without an underlying constitutional violation). Since the district court did not err in finding the false arrest claim survives summary judgment, however, the *Monell* claim also survives.

## III. The Phillipses' Cross-Appeal

### A. Standard of Review

"We review the district court's grant of summary judgment de novo, viewing all admissible evidence 'in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.'" *Great Am. Ins. Co. v. Emps. Mut. Cas. Co.*, 18 F.4th 486, 489 (5th Cir. 2021) (quoting *Kariuki v. Tarango*, 709 F.3d 405, 501 (5th Cir. 2013)). That said, a plaintiff cannot defeat summary judgment by submitting a mere scintilla of evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Claims Against the BSO Defendants

The Phillipses appeal the summary judgment dismissing four of their claims. We address each in turn.

1. Failure to disclose exculpatory evidence

The Phillipses claim that the BSO defendants violated their *Brady* obligations by failing to disclose exculpatory evidence. The district court

found these arguments were without merit because a *Brady* violation does not occur as long as the evidence at issue is disclosed before the end of trial. Since there was no trial in this case, the district court concluded that *Brady* did not apply. On appeal, the Phillipses argue that the district court erred in reaching this conclusion. They contend that the 404(b) hearing was being used to admit evidence for the purposes of the later trial, and that later trial itself would be summary; thus, *Brady* obligations were triggered.

The district court did not err. *Brady* forbids the prosecutors in a criminal case from suppressing material evidence regarding a defendant's innocence. *Brady v. Maryland*, 373 U.S. 83, 87 (1976); *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978). It "is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *Beasley*, 576 F.2d at 630. And "[i]t requires a retrial only if, after conviction of a defendant, it is learned that evidence requested and not produced creates a reasonable doubt that did not otherwise exist as to the guilt of the accused." *Id.* If evidence is provided to the defendant during trial, the court asks instead whether the defendant was prejudiced by the tardy delivery of evidence. *United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir. 1994). So, if the defendant is not prejudiced, then he cannot state a claim for a *Brady* violation. Here, the prosecution dropped the charges against Todd prior to trial, and Todd was never convicted. The necessary implication of this is that Todd was never prejudiced at trial by the evidence, and therefore, his *Brady* claim fails.

## 2. Failure to intervene

The Phillipses argue that Capt. Phillips knew Lt. Bletz was violating Todd's rights and had a reasonable opportunity to intervene, but failed to do so. The court was troubled by Capt. Phillips's failure to act on Detective Lombardino's report, but nevertheless concluded there was insufficient evidence to prove all the elements of a failure-to-intervene claim. The

Phillipses contend that they put forward enough facts to support their claim. They argue that, through the report of Detective Lombardino, Capt. Phillips was aware of the exculpatory evidence and knew Lt. Bletz was withholding that evidence, but did not order Lt. Bletz to disclose it. Thus, they posit, they have sufficiently supported their claim against Capt. Phillips to proceed to trial.

In order to hold an officer liable for failing to intervene, the plaintiff must demonstrate that the officer "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020). "Bystander liability requires more than mere presence in the vicinity of the violation; 'we also consider whether an officer "acquiesced in" the alleged constitutional violation.'" *Id.* (quoting *Whitley v. Hanna*, 726 F.3d 631, 647 (5th Cir. 2013)). Applying these rules, we found an excessive force claim of bystander liability survived summary judgment when the defendant officer stood by, laughed, and encouraged the beating of the plaintiff. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). On the other hand, we dismissed false arrest claims against defendant officers when the officers reported an awareness of the general events of the false arrest but did not actively acquiesce to the violating officer's behavior. *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (per curiam).

Capt. Phillips participated in the interviews of the Phillipses during the execution of the search warrant, was involved in the decision to place posters along Old Plain Dealing Road, met with several victims, and discussed the case with various officers and the DAs. He was also briefed by Detective Lombardino regarding the detective's suspicions that Wilson was responsible for several vandalisms in 2015 and that Lt. Bletz had advised Detective Lombardino to inactivate those cases. So, he was certainly involved

in the investigation. But this does not establish that Capt. Phillips knew that Lt. Bletz was omitting exculpatory evidence and submitting false testimony to the court. The facts as alleged do not suggest that Capt. Phillips reviewed Lt. Bletz's narrative report that led to Todd's arrest or that he encouraged Lt. Bletz to make misstatements or omit exculpatory evidence. Indeed, he "scoffed at the idea that he would review a report submitted to the DA's Office." The facts suggest that Capt. Phillips may have been generally aware of Lt. Bletz's investigation's strengths and shortcomings but was not sufficiently involved to have acquiesced in the false statements. Thus, the district court correctly granted summary judgment to the BSO Defendants.

3. Failure to maintain adequate evidentiary practices

The Phillipses brought a *Monell* claim against the BSO Defendants claiming that BSO's evidentiary policies led to the false arrest. The BSO maintained a policy that provided:

> A detective completing a case shall prepare the case file for the prosecution. This shall include providing the DA's Office copies of all reports, warrants, subpoenas, photographs, and any other documentation related to the case that would aid in a conviction.

The Phillipses argued to the district court that this policy led to Todd's harms because it explicitly requires that detectives provide only inculpatory evidence. The court agreed that the policy was flawed, but found that the Phillipses failed to raise a genuine dispute of material fact because (1) the BSO Defendants provided affidavits that stated that the general practice was to turn over the entire case file and (2) the policy was not the "moving force" underlying Lt. Bletz's conduct.

The district court was correct. A municipality may be held liable for a *Monell* claim if there is (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a

constitutional violation occurred whose "moving force" was that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578–79 (5th Cir. 2001). "[M]oving force" refers to a requirement that there be a "causal link" between the challenged policy and the underlying constitutional violation. *Id.* at 580. If the policy is not facially unconstitutional, a plaintiff must show that it was "adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (cleaned up) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)). Generally, to find deliberate indifference, a plaintiff must present a pattern of abuses, not an isolated violation. See *Piotrowski*, 237 F.3d at 582.

Here, the constitutional violation is the allegedly false arrest. That violation is premised on Lt. Bletz making false statements in and omitting exculpatory evidence from his narrative report and testimony. To be sure, the BSO's policy is questionable—it is not hard to imagine that a policy like this one would lead to police failing to disclose to the DA exculpatory evidence. The problem with the Phillipses' claim is that they did not put forward sufficient facts to support that this is what happened here. Various officers testified that the actual practice was to turn over the entire case file, not only the parts of the file that aided a conviction. Indeed, Lt. Bletz's behavior in this case presents the only known instance of an officer failing to provide the entire file, and there is no evidence that he acted in this manner because of the policy. Thus, the plaintiffs have not demonstrated a pattern or practice of fraudulent conduct by BSO officers that BSO policymakers were aware of but ignored. Therefore, the Phillipses did not show that the policy was the "moving force" behind the false arrest and the district court correctly dismissed this claim.

4. Failure to supervise

The Phillipses also argued to the district court that Capt. Phillips failed to adequately supervise his deputies, and this failure to supervise ultimately led to Todd's unlawful arrest and prosecution. But the court found that the Phillipses failed to raise a genuine issue of material fact given the uncontested facts that much of the case work was supervised by Capt. Phillips.[8]

When a plaintiff alleges a failure to train or supervise, he or she must show three things: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)). Deliberate indifference in turn generally requires that the plaintiffs demonstrate a pattern of misconduct that the defendants chose to ignore. *Id.* The Phillipses must show that Capt. Phillips's lack of supervision was the cause of Lt. Bletz's false statements to the state court. They failed to do so. First, the facts demonstrate that Capt. Phillips took a fairly active role within the investigation of Todd—he attended the search and interview of the Phillipses, he assisted in placing the signs outside of the Phillipses' home, he personally issued the citation for Todd's arrest, and he discussed the investigation with Lt. Bletz. Second, while Capt. Phillips did fail to review Lt. Bletz's narrative report, and reportedly does not review most case files, the Phillipses do not raise facts that suggest his choice not to review the case file reflected the knowing disregard of the risk that Lt. Bletz

---

[8] The district court did not dismiss the Phillipses' claim of negligent supervision with regard to how the BSO officers interacted with their confidential informants.

would submit false statements. Thus, the Phillipses failed to offer evidence of deliberate indifference by Capt. Phillips and the district court properly dismissed the claim.

### C. Claims Against the DA Defendants

The Phillipses also appeal the summary judgment dismissing their false arrest and malicious prosecution claims against ADA Holland.

1. False Arrest

The Phillipses lodge their false arrest claims against the DA Defendants as well as the BSO Defendants. The DA Defendants, like the BSO Defendants, argued that (1) the arrest was supported by probable cause or (2) they were entitled to qualified immunity. Specifically, the Phillipses argued that ADA Holland would not be entitled to qualified immunity because he purposefully elicited and submitted false information to the state court. Unlike the claim against Lt. Bletz, however, the district court declined to find that ADA Holland intentionally or recklessly submitted false evidence to the court as the fraudulent actions were attributable solely to Lt. Bletz. The Phillipses contend this was error. Like Lt. Bletz, they argue, ADA Holland acted with tunnel vision and ignored all evidence that would have supported Todd's innocence, even going so far as to shut down a potentially exculpatory investigation.

As a preliminary matter, ADA Holland does not assert that he is entitled to absolute immunity. Thus, we examine only whether he is entitled to qualified immunity. The Phillipses assert the same false arrest claim against ADA Holland as they do against Lt. Bletz—that is, that ADA Holland intentionally or recklessly made false statements of material fact and omitted exculpatory information by submitting Lt. Bletz's testimony and report to the court. *See Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019); *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006). The issue here is whether the

Phillipses submitted facts that support that ADA Holland knew or recklessly disregarded the truth of Lt. Bletz's testimony and narrative report at the time of Todd's 2017 arrest.

The Phillipses have not put forward such facts. Lt. Bletz omitted exculpatory evidence from the case file and narrative report prior to submitting the report to ADA Holland. Thus, accepting plaintiff's facts as true, it appears that Lt. Bletz deceived ADA Holland as well as the state court. The Phillipses contend that ADA Holland's review of the narrative report and case file *should have* put him on notice that Todd was not the right culprit, but that does not allow for the inference that ADA Holland knew or recklessly disregarded the truth—at best, it shows that ADA Holland may have been negligent. And while ADA Holland likely should have been more thorough in his own review, negligence alone cannot satisfy the false arrest standard. *Cf. Franks v. Delaware*, 438 U.S. 154, 170 (1978) (explaining there is no constitutional violation in "instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination").[9]

As noted by the district court, ADA Holland's advice to the BSO to end its January 2017 task force is concerning. When ADA Holland learned of the task force, he told Sheriff Whittingham that he had an "ample, solid

---

[9] And to the extent the Phillipses do provide examples of ADA Holland allowing testimony that he should have known was false, the record shows ADA Holland also introduced evidence that undermined that evidence. The Phillipses point to Lt. Bletz's testimony about the Powerade bottle being unidentifiable, but ADA Holland also submitted a picture of the bottle; they point to Lt. Bletz's testimony about the statement of the handwriting expert, but ADA Holland also called that expert directly; and they point to Lt. Bletz's statement regarding the cell-phone records, but ADA Holland also called the cell-phone-record expert. That ADA Holland did not think highly of Lt. Bletz's investigatory skills also does not lend itself to an inference that he was enabling Lt. Bletz to lie on the stand.

case" against Todd and that he did not need more evidence, so the Sheriff halted the task force. ADA Holland's advice was questionable, given a prosecutor's duty under *Brady* to "learn of any favorable evidence known to others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Nevertheless, it still does not permit the inference that, in January 2017, ADA Holland knew that the task force revealed exculpatory evidence and sought to halt its disclosure. Moreover, to lose his claim of qualified immunity, ADA Holland must have violated law that is *clearly established*, and the Phillipses have not directed this court to any case that demonstrates a prosecutor may not inform an investigatory team that he believes he has sufficient evidence to bring charges. Therefore, the district court properly granted summary judgment on behalf of ADA Holland.

2. Malicious Prosecution

The Phillipses claimed that ADA Holland's prosecution of Todd was an act of malicious prosecution. The DA Defendants responded that the Phillipses did not put forward any evidence of malice, and the court agreed. The issue, per the court, was that all acts of malice were attributable to Lt. Bletz and not ADA Holland. Thus, it granted summary judgment to the DA Defendants.

> Under Louisiana law, malicious prosecution requires:
>
> (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damages conforming to legal standards resulting to plaintiff.

*Miller v. E. Baton Rouge Parish Sheriff's Dep't*, 511 So. 2d 446, 452 (La. 1987). Malice is a question of fact, and "may be inferred from the lack of probable

cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights." *Id.* at 453. As the district court properly concluded, if the lack of probable cause cannot be attributed to ADA Holland's actions, then one cannot use that lack of probable cause to infer ADA Holland's malice. The Phillipses also submitted independent acts of ADA Holland. These included his statements that he would file more charges against Todd in order to coerce a plea; that he wished to "sip a beer and smoke a cigar [at] Hooter's" to discuss trial strategy with Lt. Bletz; and that he had a "constitutional right to prosecute whomever [he] want[s] when [he] want[s]." Malice, however, requires that "hatred, animosity, or ill will [be directed] toward the plaintiff." *Miller*, 411 So. 2d at 453. This conduct does not amount to particularized hatred or ill will toward Todd more than any other defendant. *Cf. Jenkins v. Baldwin*, 801 So. 2d 485, 500–01 (La. App. 2001) (finding no malice by a city when it, through negligence or confusion but not ill will toward the defendant, sent home a potentially exculpatory witness before that witness testified). While ADA Holland's actions may not reflect the virtues that we wish to see from prosecutors, they do not reflect malice. Thus, the district court's granting of summary judgment is affirmed.

## IV. Conclusion

Because neither the appellants nor the cross-appellants demonstrated an error on the part of the district court, we DISMISS the appellants' interlocutory appeal for lack of jurisdiction and we AFFIRM the summary judgments challenged by the cross-appellants and granted by the district court.